BEVERLY R. AND LINDA L. ROBERTS, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 7262–71—7266–71. Filed September 6, 1973.

*John N. Lampros*, for the petitioners.
*Robert K. Dixon*, for the respondent.

The Commissioner determined deficiencies in income tax as follows:

| Docket No. | Petitioner | Year | Amount |
|---|---|---|---|
| 7262–71 | Beverly R. and Linda L. Roberts | 1968 | $1,032.70 |
| 7263–71 | Alfred H. and Clara Underwood | 1968 | 2,793.54 |
| 7264–71 | Richard H. and Virginia S. Berry | 1968 | 1,368.26 |
| 7265–71 | Jack J. and Ann E. Randall | 1965 | 675.28 |
| | | 1968 | 692.98 |
| 7266–71 | Herbert R. and Louise G. Alcorn | 1968 | 2,797.25 |

The sole issue is whether a steel tower and concrete base, constructed in 1968 as the principal structural components of a passenger-carrying amusement device, qualified as "section 38 property" eligible for the investment credit. The deficiency for 1965 in docket No. 7265–71 is attributable to the disallowance of a carryback of a portion of the disallowed 1968 investment credit.

### FINDINGS OF FACT

The parties have filed a stipulation of facts which, together with accompanying exhibits, is incorporated herein by this reference.

The petitioners in each respective docket filed a joint Federal income tax return for 1968 with the Internal Revenue Service Center at Philadelphia, Pa. The petitioners in docket Nos. 7262–71, 7264–71, and 7265–71 reside in Salem, Va., and those in docket Nos. 7263–71 and 7266–71 reside in Blacksburg, Va.

---

[1] Cases of the following petitioners are consolidated herewith: Alfred H. and Clara Underwood, docket No. 7263–71; Richard H. and Virginia S. Berry, docket No. 7264–71; Jack J. and Ann E. Randall, docket No. 7265–71; Herbert R. and Louise G. Alcorn, docket No. 7266–71.

Burra, Inc., is a South Carolina corporation with its principal place of business in Salem, Va. It was an "electing small business corporation" during 1968, and it and its shareholders were thus taxed under sections 1371, *et seq.* (subchapter S) of the 1954 Code. The stock in Burra, Inc., was then held by the male petitioners, as follows:

| Stockholder | Number of shares | Percentage |
|---|---|---|
| Beverly R. Roberts | 216 | 27 |
| Alfred H. Underwood | 196 | 24½ |
| Richard H. Berry | 96 | 12 |
| Jack J. Randall | 96 | 12 |
| Herbert R. Alcorn | 196 | 24½ |
| Total | 800 | 100 |

Each stockholder shared in the income and investment credit of Burra, Inc., in the same proportion as his stockholdings bore to the total number of shares in the corporation.

In 1968, Burra, Inc., entered into a contract with Universal Design, Ltd., whereby Universal undertook to construct, erect, and install an amusement device known as a Universal Design Sky Tower at Myrtle Beach, S.C. A permit authorizing use of the proposed site—a lot located in central Myrtle Beach that was rented by Burra, Inc.— solely for construction of such a device was obtained from municipal authorities, and the Sky Tower was completed, and acquired by Burra, Inc., in 1968. Taken into account in the design of the Sky Tower were the particular meteorological and topographical conditions at its site. It has become known in the Myrtle Beach area as the "Astro Needle."

The basic structural component of the "Astro Needle" was a hollow cylindrical vertical tower approximately 175 feet in height and 4 feet in diameter, and its principal amusement feature was the panoramic view of the surrounding area available from a passenger-carrying gondola which ascended and descended the tower while rotating about it. The gondola, which encircled the tower, was built mainly of aluminum and shatterproof glass, and it had stainless steel trim and a plastic interior with fiberglass contour seats. It was heated and air-conditioned and carried 25 passengers.

At the top of the tower was an enclosed cylindrical area, approximately 6 feet in diameter and 10 feet in height, that housed an electric motor which powered the gondola-hoisting mechanism. Mounted in the top of that compartment was a large revolving plastic sphere holding a beacon light, which was required by rules and regulations of the Federal Aviation Administration. The number "200", representing the approximate elevation of the tower, was marked on the sphere's exterior.

The tower itself consisted of four 2-inch-thick steel sections which

were welded or bolted to each other and to the spiral base of the tower. The base was made of poured concrete and was much wider than the tower—approximately 34 feet in diameter. It was set on approximately 80 pilings driven into the ground to a depth of approximately 40 feet. The base was further supported and improved by a circular, graded brick wall (approximately 7 feet high at the top of the grade) with circumferential railings set into its top surface. The area enclosed by the railings was used as a boarding ramp and also contained an operator control station. The control station was a wooden structure containing pushbutton-operated electrical switches which controlled the ride cycle. Within the base was a chamber of approximately 5 feet by 7 feet by 7 feet that housed electrical equipment, a generator which provided auxiliary power, and miscellaneous tools. The chamber was air-conditioned and could be entered through a doorway, but it was not used as a general control station and was usually unoccupied by persons.

The gondola rotated about the tower on a large "slewing ring" which in turn rested upon a collar. Electrical energy was conveyed to a collar motor, which turned the gondola and powered its lights and air-conditioning, through copper contact tubes running along most of the tower's length. The collar and gondola moved up and down the the tower along two 6-inch-wide steel guide rails which were fastened to the tower's exterior 180 degrees apart and ran from the base to the electrical equipment compartment at the top. The collar was raised and lowered by means of a counterweight within the tower; the counterweight was connected to the collar by steel cables running from the inside to the outside of the tower through pulleys located at the top. The inside of the tower was accessible from the chamber in the base, and a ladder attached to the inner surface of the tower provided a means of reaching the hoisting mechanism.

Passengers boarded the gondola from the platform atop the tower base. After the gondola door was securely latched, an operator at the control station pushed a button to start the ride, whereupon the gondola began to ascend the tower, rotating slowly about it. The gondola remained at the top of the tower long enough to make one complete rotation and then descended while continuing to rotate. The entire ride lasted approximately 2 minutes. The "Astro Needle" was used solely for amusement purposes and was not economically adaptable to any other use. The device could not be usefully operated if any of the major structural and mechanical components were removed, but many components were readily replaceable.

Petitioners treated the major components of the "Astro Needle" as a unit for depreciation purposes, assigning the structure a useful life of 15 years. Certain parts, however, including cables, pulleys, and cer-

tain motors and electrical equipment, had substantially shorter useful lives than the basic tower structure.

Burra, Inc., paid Universal Design, Ltd., the sum of $176,000 under the contract for the "Astro Needle." Sales tax on the purchase amounted to $1,334.83. In 1968, Burra, Inc., acquired certain property in, on, or around the "Astro Needle" at a cost of $9,584.51. On their respective 1968 tax returns, the petitioners claimed investment credits in respect of Burra, Inc.'s aggregate 1968 "Astro Needle"-related investment ($186,919.34). The Commissioner apportioned the aggregate expenditure among specific components of the "Astro Needle" and determined that certain of those components constituted "section 38 property" eligible for the investment credit and that other components did not so qualify. The parties have each made further concessions in respect of certain components, and the petitioners have stipulated to the reasonableness of the Commissioner's allocation of the $186,919.34 for purposes of this case. The portion of that sum thus no longer in dispute has been disposed of by the parties as follows:

|  | Conceded by petitioners not to be "section 38 property" | Conceded by the Commissioner to be "section 38 property" |
| --- | --- | --- |
| Ticket booth | $1, 444. 23 | |
| Sign | 4, 043. 78 | |
| Lighting | 1, 318. 44 | |
| Brick wall | 431. 95 | |
| Gondola | | $27, 584. 49 |
| Stereo tape player | | 544. 00 |
| Ticket machine | | 250. 00 |
| Stools | | 20. 50 |
| Gondola hoisting equipment | | 17, 390. 13 |
| Turnstiles | | 909. 77 |
| Auxiliary power generator | | 4, 797. 28 |
| Engineering on hoisting equipment | | 8, 994. 89 |
| Electrical system | | 7, 305. 77 |
| Tower lights | | 621. 84 |
| Sales tax applicable to qualified investment | | 501. 11 |
| Total | 7, 238. 40 | 68, 919. 78 |

The sole items remaining in issue are the tower structure itself (including the base), with an agreed allocated cost of $109,928, and the sales tax applicable thereto, in the amount of $833.16. It is stipulated that the "Astro Needle" is not used in any of the activities specified in section 48(a) (1) (B) of the 1954 Code.

OPINION

RAUM, *Judge:* At issue is whether the concrete base of the "Astro Needle" and the steel tower attached thereto constituted "section 38 property," thus qualifying the portion of Burra, Inc.'s investment

allocable to those components for the investment credit allowed by section 38, I.R.C. 1954. "Section 38 property" is defined by section 48 (a)(1) of the Code.[2] Petitioners have taken the position that the "Astro Needle" and all of its components represented items of "tangible personal property" within the meaning of section 48(a)(1)(A). They have not argued that the device was an "elevator" under section 48(a)(1)(C), and it is stipulated that the structure was not used in any of the activities that might have qualified it as "section 38 property" under section 48(a)(1)(B), which relates to certain tangible property other than personalty. We hold that the tower and base cannot be classified as "personal property."

It is clear from certain of the legislative materials accompanying the first enacted investment credit statute, which is applicable here, that Congress intended the term "personal property" to be liberally construed and not to be limited by rules of local law. Thus, certain business assets of a mechanical nature, e.g., gasoline pumps, or those classified as "fixtures" under local law are to be treated as personalty for investment credit purposes. But inherently permanent structures annexed to the realty, e.g., buildings, oil and gas pipelines, railroad track and signals, and fences, were meant to fall within the category of "other tangible property" under section 48(a)(1)(B) and not to be regarded as "personal property." See H. Rept. No. 1447, 87th Cong., 2d Sess., pp. 11–12, A17–18 (1962); S. Rept. No. 1881, 87th Cong., 2d Sess., pp. 16, 154 (1962). The relevant regulations[3] are consistent with the foregoing principles.

---

[2] Prior to amendment by secs. 102(a)(2) and 104(a)(1) of the Revenue Act of 1971, Pub. L. 92–178, 85 Stat. 497, sec. 48(a)(1) provided as follows:

SEC. 48. DEFINITIONS; SPECIAL RULES.

(a) SECTION 38 PROPERTY.—

  (1) IN GENERAL.— * * * the term "section 38 property" means—

    (A) tangible personal property, or

    (B) other tangible property (not including a building and its structural components) but only if such property—

      (i) is used as an integral part of manufacturing, production, or extraction, or of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services, or

      (ii) constitutes a research or storage facility used in connection with any of the activities referred to in clause (i), or

    (C) elevators and escalators * * *.

Such term includes only property with respect to which depreciation (or amortization in lieu of depreciation) is allowable and having a useful life (determined as of the time such property is placed in service) of 4 years or more.

[3] Sec. 1.48–1. Definition of section 38 property.

  (c) Definition of tangible personal property. If property is tangible personal property it may qualify as section 38 property irrespective of whether it is used as an integral part of an activity (or constitutes a research or storage facility used in connection with such activity) specified in paragraph (a) of this section. Local law shall not be controlling for purposes of determining whether property is or is not "tangible" or "personal." Thus, the fact that under local law property is held to be personal property or tangible property shall not be controlling. Conversely, property may be personal property for purposes of the investment credit even though under local law the property is considered to be a fixture and therefore real property. For purposes of this section, the term "tangible personal

Tangible assets are thus to be classified as either "personal property" or "other tangible property" depending upon the fashion in which they are affixed to the land and how permanently they are designed to remain in place. See *Joseph Henry Moore*, 58 T.C. 1045, 1051–1053; *Estate of Shirley Morgan*, 52 T.C. 478, 482–483, affirmed per curiam 448 F. 2d 1397 (C.A. 9); cf. *Minot Federal Savings & Loan Assn.* v. *United States*, 435 F. 2d 1368, 1369–1371 (C.A. 8). Due regard, however, must always be given to the legislature's stated desire that "personal property" not be given a narrow construction, particularly in a case involving business assets in the nature of machinery.

With the foregoing principles in mind, it is our judgment that neither the base of the "Astro Needle," which was made of concrete and set upon numerous pilings driven far into the ground, nor the 175-foot-high steel tower, the components of which were bolted and welded to each other and to the base, can reasonably be regarded an item of personal property. It is obvious even to one having only a layman's understanding of engineering principles that the base could be separated from the realty and kept intact only with the greatest difficulty; the tower, although surely more susceptible of removal than the base, was nonetheless sturdily constructed and quite firmly anchored. Moreover, it is clear from the record that the entire "Astro Needle" installation was designed to stand safely at only one site. Even if the "Astro Needle" might be regarded as a type of "machinery," to hold that such a formidable structure was not "inherently permanent" would obliterate the distinction between "personal property" and "other tangible property." Like the relevant assets involved in *Estate of Shirley Morgan*, 52 T.C. 478, 483, affirmed per curiam 448 F. 2d 1397 (C.A. 9) (dock pilings); Rev. Rul. 71–377, 1971–2 C.B. 63 (giant amusement slides); Rev. Rul. 69–169, 1969–1 C.B. 27 (cable support towers of ski-lift); and Rev. Rul. 67–23, 1967–1 C.B. 5 (metal towers of outdoor lighting facility), the tower and base constituted an inherently permanent type structure and were not "personal property."

*Decisions will be entered under Rule 50.*

property" means any tangible property except land and improvements thereto, such as buildings or other inherently permanent structures (including items which are structural components of such buildings or structures). Thus, buildings, swimming pools, paved parking areas, wharves and docks, bridges, and fences are not tangible personal property. Tangible personal property includes all property (other than structural components) which is contained in or attached to a building. Thus, such property as production machinery, printing presses, transportation and office equipment, refrigerators, grocery counters, testing equipment, display racks and shelves, and neon and other signs, which is contained in or attached to a building constitutes tangible personal property for purposes of the credit allowed by section 38. Further, all property which is in the nature of machinery (*other than structural components of a building or other inherently permanent structure*) shall be considered tangible personal property even though located outside a building. Thus, for example, a gasoline pump, hydraulic car lift, or automatic vending machine, although annexed to the ground shall be considered tangible personal property. [Emphasis supplied.]