FILM N' PHOTOS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Film N' Photos, Inc. v. Commissioner
Docket No. 7158-76.
United States Tax Court
T.C. Memo 1978-162; 1978 Tax Ct. Memo LEXIS 353; 37 T.C.M. (CCH) 709; T.C.M. (RIA) 780162; April 27, 1978, Filed Joel P. Kay, for the petitioner. James N. Mullen and Alice Gresham, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency of $12,087 in petitioner's Federal income taxes for the taxable year ended June 30, 1973 and a deficiency of $25,990 for the taxable year *354 ended June 30, 1974. Some of the issues have been conceded, leaving the following issues for our adjudication: (1) Whether certain structures known as merchandising huts or merchandising units are tangible personal property within the meaning of section 48(a)(1)(A), I.R.C. 1954, [1] thereby rendering petitioner's investment in these structures eligible for the investment credit provided by section 38; and (2) whether these structures are section 1250 property, the rate of depreciation on which is limited to the 150% declining balances method pursuant to section 167(j)(1). FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioner Film N' Photos, Inc. is a corporation organized under the laws of Texas in 1968. Its principal place of business is in Houston. Petitioner employs an accrual method of accounting and reports its income on the basis of a fiscal year ending June 30. For the taxable years at issue herein, petitioner timely filed its Federal income tax returns *355 with the District Director of Internal Revenue in Austin, Texas. Petitioner's primary business activity is the sale, developing and processing of color photographic film. In addition, petitioner sells at retail cameras and photographic accessories. Petitioner's customers deliver film for processing, pick up processed film, and purchase film and photographic accessories from petitioner at merchandising units or huts. These are small structures with walls, floors, ceilings, roofs, doors and windows. Most of these merchandising units are located in the Houston metropolitan area. There are some merchandising units at other locations in Texas, and a few are located outside the state. Generally, these merchandising units are located in shopping center parking lots. A merchandising unit is a prefabricated rectangular structure approximately 7 feet tall, 10 feet wide and 4-1/2 feet deep, with a flat overhanging roof supporting a Film N' Photos sign. On top of the roof is a rotating sign designed to resemble a box of color film. All merchandising units were made by La Porte Corporation at its plant in Baytown, Texas. In general, the materials from which a unit is constructed consist *356 of metal structural tubing, glass windows and formica or thermastone [2] panels. At the time of the trial, petitioner had approximately 124 merchandising units in service. Customers who deliver film for processing or pick up processed film at a merchandising unit transact their business through sliding windows and do not enter the unit itself. At some units customers can drive their cars alongside these windows to deliver or pick up their film without leaving their cars. At other units only walk-up service is provided. Generally, only one sales person occupies a unit, which is operated on an eight-hour basis. When the unit is not staffed by a salesperson, a customer may nevertheless deliver film for processing by placing it in a "night drop" slot. No processing or developing is done in the merchandising units. Rather, film is developed and processed in a central laboratory in Houston. Independent laboratories develop film for petitioner in out of state transactions. The merchandising units contain no plumbing facilities and are not connected to a sewer system. There is, however, *357 an electrical hookup. Generally, within the confines of a merchandising unit for the use of the salesperson are a cash register, a safe, a chair, a telephone, and shelves and bins for processed and unprocessed film. All units are cooled by a window air conditioning unit, and about half of the units have a window-type combination cooling and heating unit. There are two fluorescent lights on the interior ceiling of the unit. The merchandising units are depreciable for Federal income tax purposes. During the years in issue, the units, when set on location for use, were placed on a base which was either a concrete oval shaped "island" or a rectangular base of the same dimensions as the merchandising unit. The oval bases, approximately 18 feet long and 7 feet wide, were used where drive-up sales were possible; the rectangular bases were used where only walk-up sales were feasible. These concrete bases, approximately 6 inches in height, serve as the floors of the merchandising units. A merchandising unit without a base weighs between 1500 and 2000 pounds. The oval island base weighs approximately 8500 pounds, and the rectangular base weighs in the neighborhood of 5000 pounds. [3] *358 The merchandising units are welded to steel plates cast in the concrete base at seven locations: one at each corner, one on each side of the door, and one on the wall opposite the door. The welds are approximately two inches long and one quarter inch thick. Both types of bases are generally constructed on location *359 at the time the unit is placed thereon for operation. When a base is made on location, a visquene (plastic) sheet is first placed on the parking lot surface. This sheet both prevents the base from bonding to the surface and acts as a vapor barrier. The construction design and type of anchorage used for the merchandising units are similar to those used for permanent structures such as housing and other buildings in the Houston area, where it is customary to build houses on concrete slabs. The design drawings for the merchandising units bear the stamp of a registered, professional engineer. This stamp signifies that the units are structurally sound and safe. The units are designed with a wind load resistance of 40 pounds per square foot. The merchandising units are movable. They are placed on location and on occasion moved to other locations on an 8000 pound capacity trailer. The trailer can carry two units at a time without their bases. The units are usually unloaded and rolled onto location by use of pipes or rollers. When a merchandising unit is moved from one location to another or placed in storage, the base is generally not detached from the unit. During the years in *360 issue, no units were moved without their bases. When a unit is moved from one location to another with the base, a lowboy trailer is generally used, and the trailer is loaded by means of a 20,000-pound capacity forklift or by a winch and cable which pull the unit onto the trailer. The merchandising units are not large enough to necessitate the obtaining of a highway permit before they can be moved in the state of Texas. When a merchandising unit is moved without its base, the base is abandoned. It takes about 15 minutes to detach the unit from the base by use of a cutting torch. Loading the unit on the trailer requires an additional 45 minutes. If the unit is moved with the base, it requires approximately 45 minutes to load the unit on the lowboy. In the two years preceding the trial of this case, petitioner had relocated or placed in storage between 20 and 30 merchandising units.Moving a merchandising unit does not significantly affect the unit, its base or the real property on which the unit was located. Normal maintenance on a merchandising unit consists of washing and painting both the exterior and the interior. Occasionally repairs may be required for damages resulting *361 from an automobile collision. These repairs have ranged in cost from $200 to $4000. Some merchandising units located in Corpus Christi were destroyed during a hurricane. Generally, however, the units hold up well to normal weather conditions. The first unit ever placed on location by petitioner, in 1968, was still in operation at the time of the trial in this case. If kept in good repair, a merchandising unit could withstand normal weather conditions and remain in service for 50 years or more. A merchandising unit is placed on location and is operated pursuant to a lease agreement with the owner of the real property. The typical lease specifically provides that either the lessor or lessee can cancel the lease upon 90 days written notice to the other party if in the judgment of either party business conditions warrant cancellation. Petitioner insists that this provision be included in the leases so that it may remove merchandising units in locations that prove to be unprofitable. The lease is customarily for a period of 10 years, and the lessee has an option to renew the lease for three additional five-year periods on the same terms and conditions as those set forth in the *362 original lease agreement. If a particular location proves profitable, petitioner anticipates renewal of the lease upon expiration, and expects to leave a merchandising unit in place for 20 years or more at a profitable location. Pursuant to a clause in the lease, the lessor and petitioner, as lessee, agree that the merchandising unit to be installed is not to be considered part of the realty and is to be removed by petitioner upon termination or cancellation of the lease, with the premises restored to the condition in which they existed prior to the installation of the merchandising unit. Most of the merchandising units are located in incorporated towns, which impose personal property ad valorem taxes on the units. No jurisdiction having taxing authority imposes real property ad valorem taxes on the units. Incorporated areas, however, generally require that petitioner obtain building and electrical permits before installing a merchandising unit on location. During the fiscal years involved herein the approximate average cost of a merchandising unit was $5,400. This figure includes the following costs: $400 for the base; $100 for a safe; $600 for the sign and rotary motor on *363 top of the unit; $270 for the heating-air conditioning unit; $325 for the bins and storage cabinet; and $1,600 for the illuminated signs around the top of the unit. Not included in the above figure, but added to the merchandising unit cost was the cost of transporting and installing the units. This cost ranged from $1,500 to $2,000, depending on the distance between the plant where the unit was constructed and the location for the unit. During the fiscal year ended June 30, 1973, costs for the merchandising units totaled $140,764. For the fiscal year ended June 30, 1974, the total of these costs was $279,341.44. During the fiscal years ended June 30, 1973 and June 30, 1974, 29 and 52 units respectively were placed on location, of which 9 and 16, respectively, were moved to other locations. On its Federal income tax return for the taxable year ended June 30, 1973 petitioner included the $140,764 expended for merchandising huts in the amount representing its qualified investment in section 38 property subject to the investment credit. On its return for the taxable year ended June 30, 1974 petitioner likewise treated the amounts expended for merchandising units as part of the sum *364 representing its qualified investment in section 38 property. In addition, on its returns for both fiscal years petitioner computed its depreciation deductions with respect to the merchandising units using the 200% double declining balance method. In his notice of deficiency respondent determined that the merchandising units constituted section 1250 property, the allowable rate of depreciation on which was limited to the 150% declining balance method under the provisions of section 167(j)(1). Accordingly, he increased petitioner's taxable income as reported for each year by the amount claimed in that year as a depreciation deduction on the huts in excess of the depreciation deduction allowable using the 150% declining balance method. In addition, respondent determined that because the merchandising units were buildings, they did not qualify as section 38 property for which the investment credit was allowable. Accordingly, he reduced the sums petitioner had claimed as qualified investments subject to the investment credit by the amounts expended for the merchandising huts, thereby disallowing the amounts claimed by petitioner as investment credits during the years in issue to *365 the extent that these sums reflected investments in merchandising units. OPINION Property which qualifies for the investment credit is known as "section 38 property." "Section 38 property" is defined in section 48, which provides, in part, as follows: SEC. 48. DEFINITIONS; SPECIAL RULES. (a) Section 38 Property.-- (1) In general.--Except as provided in this subsection, the term "section 38 property" means-- (A) Tangible personal property, or (B) Other tangible property (not including a building and its structural components) but only if such property-- (i) Is used as an integral part of manufacturing, production, or extraction or of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services, or (ii) Constitutes a research facility used in connection with any of the activities referred to in clause (i), or (iii) Constitutes a facility used in connection with any of the activities referred to in clause (i) for the bulk storage of fungible commodities (including commodities in a liquid or gaseous state), or * * *
Such term *366 includes only property with respect to which depreciation (or amortization in lieu of depreciation) is allowable and having a useful life (determined as of the time such property is placed in service) of 3 years or more. Petitioner contends that its merchandising units are "tangible personal property" within the meaning of section 48(a)(1)(A). Respondent relies heavily on the Regulations and contends that the merchandising units are buildings or improvements to land, which do not qualify as "section 38 property." Section 1.48-1(c) of the Income Tax Regulations[4] defines "tangible personal property" as "any tangible property except land and improvements thereto, such as buildings or other inherently permanent structures…" *367 In Moore v. Commissioner,58 T.C. 1045 (1972), aff'd. per curiam 489 F.2d 285 (5th Cir. 1973), we considered the question whether mobile homes constituted tangible personal property within the meaning of section 48(a)(1)(A). The mobile homes in question rested on concrete blocks, and their wheels remained intact. In that case respondent took the position that the mobile homes constituted buildings and not section 38 property. Although noting that the mobile homes had attributes generally associated with buildings, we nevertheless held them to be tangible personal property for purposes of section 48(a)(1)(A). The key to our decision in the Moore case was the phrase "buildings or other inherently permanent structures" in the fifth sentence of section 1.48-1(c) of the Income Tax Regulations, [5] which contains the definition of tangible personal property for purposes of section 48(a)(1)(A). We held that the phrase "other inherently permanent structures" after the word "building" indicated that for purposes of the investment credit, a building had to be in the nature of an inherently permanent structure on the land. Because *368 the mobile homes at issue in the Moore case were not inherently permanent structures we held them to be "tangible personal property" for purposes of section 48(a)(1)(A). [6]
Subsequent to our decision in Moore, we were confronted with the question whether floating docks qualified as tangible personal property for investment credit purposes. Docks are among the structures specified in the sixth sentence of section 1.48-1(c) of the Regulations as examples of structures not being tangible personal property. In Estate of Morgan v. Commissioner,52 T.C. 478 (1969), affd. 448 F.2d 1397 (9th Cir. 1971), we nevertheless found that floating docks did qualify as tangible personal property because they were not permanently attached or affixed to land. They floated on the *369 surface of the water and could be readily moved to other locations. Furthermore, even if the docks had been affixed to land, we said that annexation to land does not automatically preclude a classification of property as tangible personal property within the meaning of section 48. Estate of Morgan v. Commissioner,supra at 483. [7]
In Roberts v. Commissioner,60 T.C. 861, 866 (1973), we summarized our holdings in the Moore and Morgan cases as follows: Tangible assets are thus to be classified as either "personal property" or "other tangible property" depending upon the fashion in which they are affixed to the land and how permanently they are designed to remain in place. See Joseph Henry Moore,58 T.C. 1045, 1051-1053; Estate of Shirley Morgan,52 T.C. 478, 482-483, affirmed per curiam 448 F.2d 1397 (C.A. 9); cf. Minot Federal Savings & Loan Assn. v. United States,435 F.2d 1368, 1369-1371 *370 (C.A. 8). * * *
Respondent, however, relying on section 1.48-1(e), Income Tax Regs., [8] argues that the merchandising units in this case have all the attributes of buildings. They look like buildings, he asserts, and they function as buildings, providing shelter and display and work space for Film N' Photos' employees. It is true that we have applied a function or use test to determine whether a structure was a building for purposes of section 48(a)(1)(B). Satrum v. Commissioner,62 T.C. 413, 416 (1974); Central Citrus Co. v. Commissioner,58 T.C. 365, 371 (1972); Catron v. Commissioner,50 T.C. 306, 311 (1968). In the Moore and Morgan cases, supra, however, we held that before the function or use test set forth in section 1.48-1(e), Income Tax Regs., could be applied, it must first be shown that the structures in question were inherently permanent so as not to be "tangible personal property" within the meaning of section 48(a)(1)(A) and section 1.48-1(c), Income Tax Regs.[9]
*371 The focus of our inquiry in the case now before us is therefore directed not to the function served by petitioner's merchandising units, but rather to the manner in which the units were affixed to the parking lots on which they were located. During the years in issue petitioner's merchandising units were attached to concrete bases which rested on the surface of the parking lots. The concrete bases were in no way attached to the realty. In fact, before a unit was set in place a visquene sheet was placed on the surface of the parking lot to keep the base from bonding to the parking lot surface. The bases and units could be, and in fact were, removed from parking lots without causing significant damage to the base, the unit, or the parking lot. During the years here involved, 81 units were placed on location. Twenty-five of these were subsequently moved to other locations. None of these units was moved without its concrete base. Removing a unit from its location could be accomplished in a relatively short time. In our view these facts demonstrate that petitioner's merchandising units were not inherently permanent structures and that they were at all times readily movable. *372 Respondent points out that petitioner might well leave a merchandising unit in place for 20 years or more if its location proved to be profitable. Be that as it may, in our view, this fact does not render the merchandising units inherently permanent. The mobile homes in Moore and the floating docks in Estate of Morgan could well have remained in place over an extended period of time. Nevertheless, the manner in which they were affixed to land was not inherently permanent. Respondent further points out that the method of construction for the merchandising units was not significantly different than the method of construction generally used in residential construction in the Houston area, where it is common to build houses on concrete slabs. He seems to intimate that if these merchandising units qualify as tangible personal property for purposes of section 48, then so will virtually every house in that area. In our view, there is, however, a crucial distinction between the merchandising units and ordinary houses built on concrete slabs. The merchandising units could be, and were, moved in a period of 45 minutes with their bases left intact. Accordingly, we hold that during *373 the taxable years in issue petitioner's merchandising units qualified as "tangible personal property" within the meaning of section 48(a)(1)(A). Respondent concedes that our resolution of the first issue in this case controls the outcome of the second issue. As we have found the merchandising units to be tangible personal property, the limitations in section 167(j)(1) and section 1.167(j)-1(a), Income Tax Regs., do not apply to them. Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect in the years in issue.↩
2. Thermastone is a fire and weather resistant composition board made from asbestos.↩
3. Although not occurring during the fiscal years at issue herein, at the present time merchandising units are not placed on a concrete base. Instead, the units, constructed with plywood floors, are welded directly to four 2-inch by 2-inch by one-half-inch angle irons, one at each corner, 4 to 6 inches from the ground. These angle irons are in concrete feet, ten inches in diameter, which are embedded in holes in the parking lot. The holes are two feet deep and ten inches in diameter. Around the perimeter of these newer units are concrete buffers. When these newer units are relocated, the angle irons are cut off flush with the surface of the parking lot. Since this method of construction was not used in the years here before us, in our view this stipulated fact is not material in this case and, therefore, we have not considered it in reaching our conclusion.↩
4. Sec. 1.48-1(c) [Income Tax Regs.] Definition of section 38 property. * * *
(c) Definition of tangible personal property. If property is tangible personal property it may qualify as section 38 property irrespective of whether it is sued as an integral part of an activity (or constitutes a research or storage facility used in connection with such activity) specified in paragraph (a) of this section. Local law shall not be controlling for purposes of determining whether property is or is not "tangible" or "personal". Thus, the fact that under local law property is held to be personal property or tangible property shall not be controlling. Conversely, property may be personal property for purposes of the investment credit even though under local law the property is considered to be a fixture and therefore real property. For purposes of this section, the term "tangible personal property" means any tangible property except land and improvements thereto, such as buildings or other inherently permanent structures (including items which are structural components of such buildings or structures). Thus, buildings, swimming pools, paved parking areas, wharves and docks, bridges, and fences are not tangible personal property.Tangible personal property includes all property (other than structural components) which is contained in or attached to a building. Thus, such property as production machinery, printing presses, transportation and office equipment, refrigerators, grocery counters, testing equipment, display racks and shelves, and neon and other signs, which is contained in or attached to a building constitutes tangible personal property for purposes of the credit allowed by section 38↩. Further, all property which is in the nature of machinery (other than structual components of a building or other inherently permanent structure) shall be considered tangible personal property even though located outside a building. Thus, for example, a gasoline pump, hydraulic car lift, or automatic vending machine, although annexed to the ground, shall be considered tangible personal property.
5. See n. 4, infra↩. 6. Although we found the mobile homes at issue in Moore v. Commissioner,58 T.C. 1045 (1972), aff'd per curiam 489 F.2d 285 (5th Cir. 1973), to be "tangible personal property," we still held that they did not qualify as sec. 38 property because they were used primarily for lodging by non-transients. See sec. 48(a)(3)↩.
7. See also Alabama Displays, Inc. v. United States,507 F.2d 844↩ (Ct. Cl. 1974).
8. Sec. 1.48-1(e) [Income Tax Reg.], provides: (e) Definition of building and structural components. (1) Buildings and structural components thereof do not qualify as section 38 property. The term "building" generally means any structure or edifice enclosing a space within its walls, and usually covered by a roof, the purpose of which is, for example, to provide shelter or housing, or to provide working, office, parking, display, or sales space. The term includes, for example, structures such as apartment houses, factory and office buildings, warehouses, barns, garages, railway or bus stations, and stores. Such term includes any such structure constructed by, or for, a lessee even if such structure must be removed, or ownership of such structure reverts to the lessor, at the termination of the lease.Such term does not include (i) a structure which is essentially an item of machinery or equipment, or (ii) a structure which houses property used as an integral part of an activity specified in section 48(a)(1)(B)(i)↩ if the use of the structure is so closely related to the use of such property that the structure clearly can be expected to be replaced when the property it initially houses is replaced. Factors which indicate that a structure is closely related to the use of the property it houses include the fact that the structure is specifically designed to provide for the stress and other demands of such property and the fact that the structure could not be economically used for other purposes. Thus, the term "building" does not include such structures as oil and gas storage tanks, grain storage bins, silos, fractionating towers, blast furnaces, basic oxygen furnaces, coke ovens, brick kilns, and coal tipples. 9. Respondent has by Revenue Rulings specifically adopted our holdings in this regard.In Rev. Ruling 75-178, 1975-1 C.B. 9, citing Estate of Shirley Morgan v. Commissioner,52 T.C. 478 (1969), affd. per curiam 448 F.2d 1397 (9th Cir. 1971), and Roberts v. Commissioner,60 T.C. 861 (1973), the following standard for determining what is "tangible personal property" is adopted: The use of a functional or equivalency test (1) to classify property as inherently permanent where it is not itself physically attached to the land, or (2) to classify property as a structural component where it is not an integral part of (and therefore a permanent part of)a building, is no longer the criteria to be used to classify property. Rather, the problem of classification of property as "personal" or "inherently permanent" should be made on the basis of the manner of attachment to the land or the structure and how permanently the property is designed to remain in place." In Rev. Ruling 77-8, 1977-2 C.B. 6, respondent held that trailers used by a construction company as on-site offices were tangible personal property within the meaning of sec. 48(a)(1)(A), I.R.C. 1954, and sec. 1.48-1(c), Income Tax Regs. In reaching this conclusion, respondent specifically relied both on our holding in Moore v. Commissioner,supra, and on the above-quoted statement from Rev. Ruling 75-178↩.