MALLINCKRODT, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Mallinckrodt, Inc. v. Commissioner
Docket No. 23072-82.
United States Tax Court
T.C. Memo 1984-532; 1984 Tax Ct. Memo LEXIS 144; 48 T.C.M. (CCH) 1290; T.C.M. (RIA) 84532; October 3, 1984. Jerome Fink, for the petitioner. Donald L. Wells, for the respondent. KORNER MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: Respondent determined the *145 following deficiencies in petitioner's Federal income taxes for its taxable years 1975 and 1976: Taxable year ended
Deficiency
December 31, 1975
$24,078.31
December 31, 1976
50,031.90 The deficiency for the taxable year1975 is not in dispute. After concessions, the deficiency for the taxable year 1976 is in dispute to the extent of $13,556.00.The sole issue remaining for us to decide is whether certain non-load bearing gypsum drywall partitions, extending from the floor to the height of a false ceiling, erected or caused to be erected by petitioner at some of its locations, are tangible personal property entitled to the investment tax credit within the meaning of sections 38, 46 and 48, [1] or whether they are structural components of a building not subject to the investment tax credit. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibit attached thereto are incorporated herein by this reference. Petitioner, a Missouri corporation incorporated *146 in 1981, with principal offices in St. Louis County, Missouri, is the successor in interest through a 1982 statutory merger to a predecessor Missouri corporation of the same name (hereinafter "Mallinckrodt") which filed a 1976 corporate Federal income tax return claiming the investment credit here at issue and to which a timely issued notice of deficiency was addressed. The income tax deficiency for the calendar year 1976, in dispute to the extent of $13,556.00, wasclaimed by Mallinckrodt as an investment tax credit based upon progress payments related to construction or installation of interior partitions at petitioner's facilities. During the years 1976 and 1977, in two newly constructed office buildings serving as corporate headquarters and in another building, a manufacturing facility, Mallinckrodt caused to be installed or erected partitions dividing the interior of the buildings into office, utility, and other spaces. Mallinckrodt used so-called "structure to structure" or "slab to slab" partitions, which were attached to the masonry floor of the building, intersected the false ceiling, and were attached to the real masonry ceiling, for areas in the building with *147 special needs for privacy and soundproofing, such as for higher ranking executive offices and some conference rooms.No investment tax credit was either claimed nor allowed for these partitions. Another type of space divider was used by Mallinckrodt to create, in the non-perimeter spaces of the building, stenographic, clerical, and other work spaces. These partitions were five and one-half feet high, metal, interlocking, and fastened to one another to form self-stabilized space dividers. These assembled partitions were not attached to the floor of the building and did not reach either the false or the true masonry ceiling. Investment tax credit was claimed and allowed on these partitions. In addition to the previously described offices, Mallinckrodt used offices 10'X15' in dimension for lower ranking employees. These offices utilized the load bearing exterior masonry wall of the perimeter of the building with its window as one side. The side of these offices opposite the perimeter wall consisted of a partition of glass with metal housing and trim, or "storefront," for which Mallinckrodt claimed, and was allowed, the investment credit. The necessary remaining side or *148 sides to complete the 10'X15' offices are the gypsum drywall partitions in dispute in this case. Similar drywall partitions were located as space dividers for utility, conference, and other rooms in the interior of the building and petitioner's entitlement to the investment credit for these partitions is also in dispute between the parties. The partitions are depreciable property with a useful life of three years or more. The partitions in issue here are installed by attaching a 25 gauge metal track or runner to the floor, using a pressure gun to shoot one-half inch long masonry nails through the steel into the concrete. Vertical 25 gauge metal supports ("C-studs") are fitted into the floor track or runner and into a similar track or runner located at the height of the false ceiling, and in some instances these vertical supports are attached to the top and bottom tracks by screws. Where the top runner or track is attached to the supporting gridwork of the false, suspended ceiling, it is done with self-tapping metal screws through the track or runner up into the metal grid. An electric screw gun is used for this purpose. The wiring to carry electricity is run into the *149 space between the vertical metal supports to outlets, switches, receptacle boxes and thermostats, if necessary. A single layer of gypsum drywall sections with recessed edges, approximately 3/16 inch thick and either two or four feet wide and eight feet high, is attached by screws to each side of the vertical supports. The joints between the drywall sections are concealed with three coats of joint compound, necessitating approximately 24-hour drying time between applications, and tape. The joints are then finished by sanding, and the finished sections are then either painted to the desired color or finished with a textured vinyl wall-covering. Approximately two-thirds of the partitions at issue were covered with vinyl wall-covering. Subsequent to the installation of the partitions here at issue, wall-to-wall carpeting was laid in the office areas abutting the partitions, but not extending under any portion of those partitions. Of the total cost of installation of the partitions approximately 48 percent is attributable to the metal track and vertical supports and 52 percent to the gypsum drywall. Gypsum drywall partitions, installed in the manner herein described, can be dismantled *150 without structural damage to the building itself or the suspended ceiling. Since their original installation, neither Mallinckrodt, nor anyone acting for it, has disassembled and reerected the partitions at issue, although new offices have been added. Mallinckrodt never adopted a procedure or plan for dismantling and moving the partitions. As a construction industry custom, however, no effort is usually made to save the drywall itself in disassembling the partitions. Because of the low cost of gypsum board, compared to the cost of taking down and reusing the same materials, the least expensive and most expeditious way to relocate these drywall partitions is to demolish them. The only portions which are typically salvaged for reuse are some of the metal framing and studs. When saving the drywall for reuse is desired, in spite of the additional cost, the partitions may be disassembled by pulling off a two-feet wide drywall section, most probably resulting in its loss. This opens access to the studs and to the screws attaching the remaining drywall sections to the studs. Disassembly requires that all the C-studs be installed with the opening facing the same direction. *151 The screws are then removed with a tapping hammer or chisel. The tapes over the drywall joints are cut with a drywall knife and the drywall sections are then taken down individually. If the gypsum is damaged when the screws pop out, it can be repaired by putting coats of joint compound in the hole and waiting 24-hours between applications. The sections would then be refinished by sanding. Where the partitions are covered by vinyl wall-covering, removal is done by tearing it off in strips. A sizing coat would have been previously applied to the partitions in order to facilitate later removal of the wall-covering. Should any vinyl residue remain on the panel facing, it could be smoothed out by applying joint cement, waiting 24-hours until it dried, and sanding. The partition would then be ready to be decorated again. Whichever method of disassembly is used, the metal components are removed after the removal of the drywall. The screws in the end studs and the top channel track are backed out by reversing the electric screwdriver. The heads of the masonry nails in the floor are popped off with a hammer or chisel, the metal pin left extruding from the floor is tapped *152 and breaks off. The friction fitted studs are not otherwise attached. An exposed bare concrete strip would remain after removal of the floor track which would require that the carpeting be patched. ULTIMATE FINDINGS OF FACT 1. The partitions herein in issue are not movable partitions. 2. The partitions are incapable of being reused in their entirety, are permanently attached to the structure, have in fact never been moved and are incapable of being readily removed without substantial damage to the gypsum drywall. OPINION Section 38 allows a credit against Federal income taxes for qualified investment in section 38 property. The determination of what property qualifies as section 38 property is made in accordance with the rules provided in section 48. Section 48(a)(1) defines property that is eligible for the investment credit. [2] Depreciable tangible personal property having a useful life of three years or more is included among qualifying property, but structural components *153 of buildings are not. [3]Treas. Reg. 1.48-1(c). The term "structural components" is defined in section 1.48-1(e)(2), Income Tax Regs., as follows: The term "structural components" includes such parts of a building as walls,partitions, floors, and ceilings, as well as any permanent coverings therefor such as panelling or tiling; windows and doors; all components (whether in, on, or adjacent to the building) of a central air conditioning or heating system, including motors, compressors, pipes and ducts; plumbing and plumbing fixtures, such as sinks and bathtubs; electric wiring and lighting fixtures; chimneys; stairs, escalators, and elevators, including all components thereof; sprinkler systems; fire escapes; and other components relating to the operation or maintenance of a building. [Emphasis added.] The terms "walls" and "partitions" as used in the above-cited regulation have been interpreted as including within the *154 meaning of the term "structural components" those walls and partitions which are inherently permanent. Minot Federal Savings & Loan Association v. United States,313 F. Supp. 294 (D. N.D. 1970), affd. 435 F.2d 1368 (8th Cir. 1970). Minot involved non-load bearing *155 partitions manufactured in an assembly-line process, which could be installed in almost any type of building and were not integral parts of the physical structure. The District Court noted that the number of partitions and door units used from time to time in a building was not permanent, but varied and was dependent upon the requirements of the presently existing tenants, the terms of the rental agreements, and the needs and desires of the owners of the building. It was conceivable, as a practical matter, that a large quantity of such partition units would be in use while one floor of the building was rented to some tenants and that all would be removed to meet the desires and requirements of a subsequent tenant, resulting in the sale of the partitions by the owner, or storage thereof during the rental period. The District Court noted that the market for used, movable partitions, listed by manufacturers as "stock items," was extensive, and that they continued to possess the qualities of movability and reusability. The District Court also seemed to rely on the fact that at the time of construction no permanent floor plan was designed by the architect and no permanent *156 partitions dividing the various stories into individual offices were constructed or installed. The Court of Appeals, in describing the installation process, noted its simplicity: Their installation is a simple process consisting of fastening a channel to the floor and the ceiling, putting the partitions in place and fastening them. The channels are attached with a No. 8 sheet metal screw at the ceiling and a small masonry nail in the floor at approximately three feet intervals. Minot,supra, 435 F.2d at 1369. The Court of Appeals concluded that the movable partitions involved in the case were tangible personal property and allowed in investment credit.The holding in Minot is in accordance with the meaning of the term "tangible personal property" found in S. Rept. No. 1881, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 843, 858. For purposes of section 48, the term "tangible personal property" includes any tangible property except land, and improvements thereto, such as building or other inherently permanent structures thereon (including items which are structural *157 components of such buildings or structures). In anothercase dealing with partitions, King Radio Corp., Inc. v. United States,486 F.2d 1091 (10th Cir. 1973), the Tenth Circuit held that it was the purpose of Congress to exclude from the benefits of the investment tax credit only those partitions of the building that are permanent. King Radio involved a movable partition system consisting of ceiling height and glazed rail height partitions. The non-load bearing system consisted of the partitions and aluminum channels fastened to the floor and ceiling with small screws or masonry nails. The system could be stored when not in use, and relocation of the channels caused no noticeable damage to the structure. As in Minot, no permanent floot plan was incorporated in the architectural plans for construction of the building. The Court held that the movable partitions were tangible personal property and allowed the investment credit. [4]
*158 The Service's current position is that the classification of property as "personal" or "inherently permanent" should be made on the basis of the manner of attachment to the land or the structure, and how permanently the property is designed to remain in place. [5] The Senate Finance Committee, in its Report No. 95-1263 (1978), 1978-3 C.B. 321, 415, issued in connection with the enactment of the Revenue Act of 1978, Pub. L. 95-600, 92 Stat. 2767, stated as follows: In addition, the committee wishes to clarify present law by stating that tangible personal property already eligible for the investment tax credit includes * * * movable and removable partitions * * *. In another case dealing *159 with studded gypsum drywall partitions, the District Court held that the investment tax credit was not available because the partitions were not readily removable, were incapable of being stored, reused in their entirety, or removed without causing minor damage to the structure. The Court distinguished Minot and King Radio, noting that in both cases the movable partitions were factory assembled, capable of being stored, sold, reused in their entirety, and moved. Dixie Manor, Inc. v. United States, an unreported case ( W.D.Ky. 1979, 44 AFTR2d 79-5442, 79-2 USTC par. 9469), affd.     F.2d     (6th Cir. 1981, 47 AFTR2d 81-1298, 81-1 USTC par. 9332). Applying the above-mentioned case and legislative authorities to the facts of this case, we are persuaded that respondent must prevail. The partitions here at issue are not capable of being removed and reused in their entirety; if removed, they must be completely taken apart; under the most economical and preferred method, most of the materials are scrapped and replaced; in the best of circumstances, a 2'X8' gypsum board panel would be lost, even if salvaging the drywall is intended; *160 the walls are not capable of being stored as a unit, and are permanently attached to the structure. Petitioner argues that the partitions at issue here are easier to remove that those involved in Dixie Manor,supra. This contention is without merit. In Dixie Manor,supra,the District Court made the following statement: Technically all partitions may be moved and removed, but we believe that when the Senate spoke in terms of movable and removable partitions, it had in mind partitions which are readily moved and removed, and which would substantially remain in the same condition after removal as they were before.[6] [Dixie Manor, Inc. v. United States, an unreported case ( W.D.Ky. 1979, 44 AFTR2d 79-5442, 79-2 USTC par. 9469).] Petitioner certainly cannot sustain the argument that the drywall partitions are in the same condition after *161 being demolished as they were before. Almost any man-made structure can be disassembled and restructured, given ample time and detailed workmanship. [7] Moreover, we are not herein relying solely on the factor of ease of removability. [8]
Petitioner argues, further, that it is irrelevant *162 that the most economical and efficient way to move the partitions is to demolish them and rebuild in another location, using new gypsum board, saying "there is certainly nothing in the tax law that requires that you must do things in the most unbusinesslike and inefficient way in order to earn an investment credit." We find this argument at least convoluted, and certainly unconvincing.[9]
In Whiteco Industries, Inc. v. Commissioner,65 T.C. 664 (1975), the question was whether outdoor advertising signs constitute tangible personal property within the *163 meaning of section 48(a)(1)(A). In resolving the issue of the permanency of the property in Whiteco we addressed a number of questions. We have subsequently applied the factors therein enumerated to other property to resolve the issue of permanency. See, e.g. Standard Oil Company (Indiana) v. Commissioner,77 T.C. 349 407-409 (1981); Kimmelman v. Commissioner,72 T.C. 294, 308 (1979). [10] The questions considered in Whiteco and the answers mandated by the facts herein are as follows: (1) Is the property capable of being moved, and has it in fact been moved? The partitions here cannot be readily removed in their entirety. Partial loss of drywall would ensue even if salvage of the gypsum is intended. The partitions have never been moved, nor has Mallinckrodt adopted a plan or procedure for dismantling and moving the partitions. (2) Is the property designed or constructed to remain permanently in place? Petitioner's partitions are clearly *164 designed to remain indefinitely in the same place.The partitions were installed in such a way that any attempt to remove them would result in their destruction. There was no plan to remove the partitions, which were installed as part of the process of original construction of the building. The complicated and time-consuming process of installation of the partitions, as well as the fact that wall-to-wall carpeting was installed after the erection of the walls, and not under them, support the belief that their location was intended to be long-term, at the least. (3) Are there circumstances which tend to show the intended length of affixation, i.e., are there circumstances which show that the property may or will have to be moved? The partitions here have not been moved since their installation during the original construction of the building. Additional offices have been constructed, but no changes in the layout of the original offices have been required as a consequence. No space is leased which would require changes in the design or layout of the building in order *165 to accommodate the necessities of the tenants. The carpeting was installed after the partitions had been constructed. (4) How substantial a job is removal of the property and how time-consuming is it? Is it "readily removable?" The usual and economically effecient method to remove the instant partitions is to demolish them and throw the gypsum board away. In this sense, the partitions may be considered "readily removable." When attempting to salvage the gypsum drywall, though, the process of removing the partitions becomes a time-consuming and meticulous job. For purposes of our analysis, we consider that the second method, i.e., where salvage of the drywall is intended, as the pertinent criterion; almost any man-made structure could be removed using the "sledge-hammer method." (5) How much damage will the property sustain upon removal? If the partitions here are removed by demolishing the walls, the gypsum drywall is totally destroyed. Some of the metal parts, accounting for 48 percent *166 of the cost of installation, may be reusable. If salvaging of the gypsum drywall is intended, at least one 2'X8' panel is lost, as well as the vinyl covering. In no case can the gypsum be reused in its entirety. (6) What is the manner of affixation of the property to the land? The manner of affixation of the partitions, described in detail in our findings of fact, contrasts with the ease of the installation of the slide-in partitions involved in Minot and King Radio.[11] In our opinion, the partitions are permanently attached to the building. *167 Examination of these tests indicates that the partitions herein at issue are permanent structural components of the building and not personal tangible property. We hold, accordingly, that the partitions are not qualified property entitled to the investment tax credit. Decision will be entered for the respondent.
Footnotes
1. All statutory references herein are to the Internal Revenue Code of 1954, as in effect in the years in issue, unless otherwise indicated.↩
2. For 1976, sec. 48 provided in part as follows: SEC. 48. DEFINITIONS; SPECIAL RULES. (a) Section 38 Property. -- (1) IN GENERAL. -- Except as provided in this subsection, the term "section 38 property" means -- (A) tangible personal property, or * * * Such term includes only property with respect to which depreciation (or amortization in lieu of depreciation) is allowable and having a useful life (determined as of the time such property is placed in service) of 3 years or more. ↩
3. Sec. 48(a)(1)(B) includes certain specifically designated special use property as section 38↩ property, eligible for the investment credit, but this subsection is not applicable to the facts of this case.
4. The Courts of Appeals thus rejected the government's use of a functional equivalent or use test, as expressed in Rev. Rul. 69-14, 1969-1 C.B. 26↩, for classification of property as inherently permanent or as a structural component.
5. In response to the Minot and King Radio decisions, followed by Estate of Morgan v. Commissioner,52 T.C. 478 (1969), affd. per curiam, 448 F.2d 1397 (9th Cir. 1971), involving floating docks, and Roberts v. Commissioner,60 T.C. 861 (1973), dealing with a 200 feet steel "astro needle," the Service revoked Rev. Rul. 69-14, supra, and issued Rev. Rul. 75-178, 1975-1 C.B. 9↩.
6. It may also be added that had the Senate intended that partitions satisfy either one of the two conditions: movability or removability, it would have used the disjunctive or, instead of the conjunctive and.↩
7. A few examples could include the dismantling of brick structures, and reuse of the brick, an everyday occurrence; the dismantling of the London Bridge and reerection in the United States; and the London Church of St. Mary, Aldermanbury, rebuilt at Westminster College in Fulton, Missouri.↩
8. In Consolidated Freightways, Inc. v. Commissioner,708 F.2d 1385, 1390 (9th Cir. 1983), affg. in part and revg. in part 74 T.C. 768↩ (1980), the Court of Appeals for the Ninth Circuit reversed our determination that certain overhead doors and lighting fixtures were eligible for the investment tax credit. In that case, however, the only fact in the record regarding permanency was that the fixtures were easily removed. That case is therefore, distinguishable, and, for the present, we leave undecided the question of whether we agree with the Ninth Circuit's reversal.
9. Petitioner also ignores that where property for which an investment tax credit has been taken ceases to qualify before the close of the useful life which was taken into account in computing the credit, all or a part of the credits previously allowed must be recaptured, sec. 47. The issue whether the demolition of the drywall partitions is ceasing to be section 38↩ property ensues. Furthermore, one must also deal with the determination of the amount to be recaptured, since the metal frame and studs might be salvaged.
10. See also Shoney's South, Inc. v. Commissioner,T.C. Memo. 1984-413↩. 11. Petitioner contends that the Service has allowed the investment credit to so-called demountable partitions. Eugene Erwin, expert in the installation of lathe and plaster walls and ceilings, testified that he would classify the system as demountable and that the way partitions are called by "the people in the trade, depend[s] very much on what the architect or the specifier, whoever is giving them that work, . . . choose to say." The issue before the Court has nothing to do with how the partitions are called by whom, but with their specific characteristics. We are not convinced that these partitions have the characteristics identified in Minot and King Radio↩ as proper to partitions which can be classified as personal tangible property.