*An appropriate order will be issued.*

LODA POULTRY CO., INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 28713-83. Filed April 6, 1987.

*Albert L. Grasso* and *Donald J. Russ, Jr.*, for the petitioner.

*Michael W. Bitner*, for the respondent.

OPINION

DRENNEN, *Judge*: This case was assigned to and heard by Special Trial Judge Peter J. Panuthos pursuant to the provisions of section 7456(d)[1] (redesignated as section 7443A(b) by section 1556 of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2755) and Rule 180 et seq.[2] After review of the record, we agree with and adopt his opinion which is set forth below.

OPINION OF THE SPECIAL TRIAL JUDGE

PANUTHOS, *Special Trial Judge*: Respondent determined a deficiency in petitioner's Federal income tax in the amount of $14,718 for the taxable year ended January 31, 1980.

The issue for decision is whether an asset purchased by petitioner constitutes section 38 property (as defined by section 48) so as to qualify for the investment tax credit.

Some of the facts have been stipulated and are found accordingly.

FINDINGS OF FACT

Petitioner Loda Poultry Co., Inc. (hereinafter petitioner). is a corporation organized under the laws of the State of Illinois. Petitioner is primarily engaged in the business of selling whole chickens and chicken parts to various grocery stores in Illinois. Petitioner also engages, to a lesser extent, in the wholesaling of meat (beef, lamb, and pork), other poultry (turkey and duck), and delicatessen items (salads, oils, and the like) to a variety of outlets, e.g., grocery stores and restaurants. Petitioner also sells "chill packs" (precut portions of meat and poultry in refrigerated and/or frozen cellophane packages) to its customers. The chill packs are a relatively small part of the total operation. Petitioner also

---

[1] All section references are to the Internal Revenue Code of 1954 as amended, unless otherwise indicated.

[2] All Rule references are to the Tax Court Rules of Practice and Procedure.

engages in the business of selling chicken pieces and giblets (livers and gizzards) to third parties, including a related corporation which owns and operates Kentucky Fried Chicken restaurants throughout Illinois.

The inventory items described above (except for whole chickens) are received by petitioner in prepackaged form from independent third-party suppliers.[3] When received, they are not labeled for sale to, or otherwise identified for, a specific customer. Instead, petitioner sells the commodities on a "first-come-first-serve" basis and has the right to satisfy purchase orders from the available quantities of similar products.

Petitioner's employees cut, clean, and inspect the whole chickens. The chicken pieces which can be sold to restaurants and grocery stores are packaged. Petitioner disposes of remaining chicken parts. Petitioner does not cut other inventory items such as beef. The general public is entitled to purchase any of petitioner's inventory items.[4]

During the taxable year ended January 31, 1980, petitioner purchased and placed in service an asset[5] consisting of air-cooled condensers and a commercial engine which provide refrigeration, and five separate and distinct refrigerated areas or compartments.

A fire destroyed petitioner's previous facilities. As the result of the fire, petitioner rebuilt its corporate offices and contemporaneously acquired the subject asset. No portion of the cost of the corporate offices was included in the purchase price of the asset.

The layout and dimensions of each of the compartments of the asset are set forth on page 819.

The asset was manufactured by Master-Bilt, a manufacturer of walk-in coolers, freezers, and refrigerated holding units. The asset consists of walls, a floor, doors, a central refrigeration system, electric wiring, lighting fixtures, and a concrete base. The square footage of the asset is approximately 10,283 feet.

---

[3]The meat is received by petitioner in boxes approximately 4 feet long and 1 foot wide. They are stored until sold.

[4]The minimum amount one could purchase would be 28 chickens or an approximately 70-pound chunk of beef.

[5]Petitioner uses the term "refrigeration unit" in its brief. The parties have utilized the term "asset" to characterize the questioned item. We will utilize the term "asset", "property," or "structure," in our opinion.

| 0° Compartment<br><br>Size:<br><br>24.5' x 70' | 28° Compartment<br><br>Size:<br><br>26.5' x 70' | 32° Compartment<br><br>Size:<br><br>.31.5' x 70' | 55° Compartment<br>(storage area)<br><br>55° Compartment<br>(cutting area)<br>Size:<br>30.5' x 55' |
|---|---|---|---|
| &#124;DOOR&#124; | &#124;DOOR &#124; | &#124;DOOR&#124; | &#124;DOOR&#124; |

LOADING AREA
Size: 113' x 21'
45°

DOOR

| &#124;DOOR &#124; | &#124;DOOR&#124; | &#124;DOOR &#124; | &#124;DOOR &#124; |
|---|---|---|---|

The asset cannot be moved in one piece. In order to move the asset, it would have to be dismantled and reassembled at the new site. The concrete base (floor) can neither be moved, dismantled, nor reassembled. The asset is constructed of pre-fabricated, modular foam panels (4 inches thick) with an internal steel column and a bar joist frame which has all bolted connections. The insulation is in excess of that which might be contained in a general warehouse. The R factor is in excess of 34.[6] The asset has been placed upon an insulated/vented concrete base (containing drainage tubes), which base has poured concrete foundations. Twenty-four inch vertical steel siding has been attached to the outside of the asset. A steel-seam metal-gabled cover

---

[6]"The ability of all insulation materials to resist the flow of heat is measured in R values. R value is the resistance to heat flow and is derived by measuring the British thermal units (BTUs) that are transmitted in one hour through one thickness of the insulation. The higher the R value, the better the insulation. [American Institute of Real Estate Appraisers, The Appraisal of Real Estate 184 (8th ed. 1983). Fn. refs. omitted.]"

was placed over the asset and attached to the siding. The separate compartments of the asset are cooled by air-cooled condensers and a preassembled commercial engine.

The purpose of the air-cooled condensers and commercial engine is to cool the various compartments of the asset. The compressors are bolted to a metal frame. The metal frame is bolted to the floor. From time to time the compressors have had to be replaced. The asset was specially designed as a refrigeration structure to maintain the temperatures necessary to prevent spoilage. Thus the asset is designed in such a fashion that the temperature of each compartment can be raised or lowered.[7]

The total cost of the asset, including the concrete base, was $147,180. The cost of the air-cooled condensers and the commercial engine was $45,560.72.[8]

The five separate refrigerated areas of the asset consist of the following: (1) An enclosed refrigerated loading area from which meats, poultry, and other commodities are loaded on and off refrigerated vehicles; (2) a compartment in which the temperature is maintained at zero degrees;[9] (3) a compartment in which the temperature is maintained at 28 degrees; (4) a compartment in which the temperature is maintained at 32 degrees; and (5) a compartment in which the temperature is maintained at 55 degrees.

In the zero degree compartment, meats are stored until they are sold. The temperature is maintained at such level to prevent spoilage. Until such time as an order is received, none of the commodities stored in this compartment are associated or identified with a particular customer. All commodities stored in this compartment are completely fungible. Because of the extremely low temperature maintained within the compartment, the only employee work activity that takes place is the stacking and unstacking of the fungible commodities being stored.

---

[7]The temperature could be lowered to zero degrees in all compartments except the loading area.

[8]The parties did not indicate whether this price included the heat pump, which was part of the temperature control equipment. In any case, we believe that the same analysis applies to the heat pump as to the air-cooled condensers and commercial engine.

The parties have agreed that the balance of the cost may be reasonably allocated on the basis of square footage. The approximate dimensions of the asset are 113 feet in length by 91 feet in width.

[9]All temperature measurement references are to Fahrenheit degrees, unless otherwise indicated.

In the 28-degree compartment, meats and other poultry commodities (chill packs) are stored to prevent spoilage, pending sale to customers. Until such time as an order is received, none of the commodities stored in this compartment are associated or identified with any particular customer. All commodities stored in this compartment are completely fungible. Because of the extremely low temperatures maintained within the compartment, the only employee work activity that takes place is the stacking and unstacking of the fungible commodities being stored.

In the 32 degree compartment, poultry commodities (whole chickens and those chicken parts which have been cut into pieces) are stored to prevent spoilage pending shipment to customers. Until such time as an order is received, none of the commodities stored in this compartment are associated or identified with any particular customer. All commodities stored in this compartment are completely fungible. Because of the extremely low temperatures maintained within this compartment, the only employee work activity that takes place is the stacking and unstacking of the fungible commodities being stored.

The 55-degree compartment is divided into two parts by a wire mesh barrier. One part is utilized to store oils, shortenings, and other products used for cooking fried chicken. None of the oils, shortenings, and other commodities stored in this part of the compartment are associated or identified with any particular customer. All commodities stored in this part of the compartment are completely fungible. The only work activity that takes place in this part of the compartment is the stacking and unstacking of the fungible commodities being stored.

In the other part of the 55 degree compartment, petitioner's employees cut, clean, inspect, and package chickens. Before the chickens are packaged, whole chickens are cut into pieces. Only those pieces which can be sold to restaurants and grocery stores are packaged. The remaining parts of the chicken are disposed of. Up to eight employees of petitioner work Monday through Friday in this compartment, 8 hours per day. The activities of the employees in this regard must be conducted in a refrigerated area to prevent spoilage. Upon completion of the packaging of the

chickens, the packaged chickens are moved to the 32 degree compartment for storage to prevent spoilage pending sale to customers.

The refrigerated loading area has doors up to which trucks back for loading and unloading. Commodities are off-loaded and placed into one of the other four refrigerated storage compartments, each of which is accessible from the refrigerated loading area. Commodities which are to be shipped to customers are taken from one of the other four compartments to the loading area and placed on refrigerated trucks. The loading area is refrigerated to a temperature of approximately 45[10] degrees to prevent spoilage. In the event the outside temperature should fall below 35 degrees, heat pumps would maintain the temperature. Because of the extremely low temperature maintained within the loading area, loading and unloading are the only employee work activities which take place in this area.

The asset does not have washroom facilities, a lounge area, or other similar type areas. A washroom is available in the corporate offices which are connected to the asset by way of a common door.

## OPINION

Petitioner claims an investment tax credit for the total cost of the asset. Petitioner argues that the asset is not a building and that the asset either as a whole or in its separate parts constitutes tangible personal property within the meaning of section 48(a)(1)(A).[11] Petitioner further argues that the asset, or at least some of the compartments, is used as an integral part of the manufacturing or production activity within the meaning of section 48(a)(1)(B)(i), and that the asset, or at least various compartments thereof, qualifies as a bulk storage facility used in connection with a manufacturing or production activity within the meaning of section 48(a)(1)(B)(iii). Finally, petitioner argues that the air-cooled condensers and commercial engine are not structural components because the sole

---

[10]Although a diagram of the asset filed with the stipulation of facts indicates that the loading dock temperature is maintained at 45 degrees, petitioner's expert testified at trial that the loading dock temperature is maintained at 35 degrees. In any case, whether the temperature is maintained at 35 degrees or 45 degrees is not material to our decision.

[11]All section references are as they were effective for the year in issue.

justification for their installation is to meet temperature requirements which are essential for the processing of foodstuffs within the meaning of section 1.48-1(e)(2), Income Tax Regs.

Respondent contends that the asset is a building and thus ineligible for the investment credit. Respondent further argues that even if the asset is not a building, it does not constitute tangible personal property within the meaning of section 48(a)(1)(A). In addition, respondent argues that the asset is not other tangible property used as an integral part of a manufacturing or production activity within the meaning of section 48(a)(1)(B)(i) nor as a bulk storage facility within the meaning of section 48(a)(1)(B)(iii). Finally, respondent argues that the air-cooled condensers and commercial engine do not qualify for the investment credit because they are structural components within the meaning of section 1.48-1(e)(2), Income Tax Regs.

Section 38 allows a credit against tax for investments in certain types of property, described as "section 38 property." Section 48(a) defines section 38 property and states in relevant part as follows:

SEC. 48(a). SECTION 38 PROPERTY.—

(1) IN GENERAL.—Except as provided in this subsection, the term "section 38 property" means—

(A) tangible personal property (other than an air conditioning or heating unit), or

(B) other tangible property (not including a building and its structural components) but only if such property—

(i) is used as an integral part of manufacturing, production, or extraction, or

\* \* \* \* \* \* \*

(iii) constitutes a facility used in connection with any of the activities referred to in clause (i) for the bulk storage of fungible commodities * * *

We must first determine whether in fact the property in question constitutes "tangible personal property" within the provisions of section 48(a)(1)(A). If the asset does not qualify under that subsection, we must then examine whether the property can be considered "other tangible property" within the provisions of section 48(a)(1)(B)(i) or (iii). In order to determine whether the property in question

qualifies as "tangible personal property" or as "other tangible property," our first inquiry is whether the property or a portion thereof[12] constitutes a building. To the extent that any portion of the asset constitutes a building, it will not qualify for the investment credit.[13]

## I. *Zero-Degree, 28-Degree, 32-Degree, and 55-Degree Compartments and the Loading Area*

The term "building" is given its commonly accepted meaning. *Samis v. Commissioner*, 76 T.C. 609, 617 (1981); *Consolidated Freightways, Inc. v. Commissioner*, 74 T.C. 768, 793 (1980), affd. on this point 708 F.2d 1385, 1388 (9th Cir. 1983).[14] The regulations as well as the courts look to both the appearance and the function to determine whether the questioned property constitutes a building.[15] The courts have generally regarded the function of the asset as the more important test. *Munford, Inc. v. Commissioner*, 87 T.C. 463, 479-480 (1986); *Satrum v. Commissioner*, 62 T.C. 413, 416 (1974).

Considering the appearance of the asset, there is no question but that it looks like a building. It has a concrete base of approximately 10,283 square feet, a roof, exterior and interior walls, doors, and lighting fixtures. Despite our finding that the asset looks like a building, we must go beyond the appearance and determine whether the asset

---

[12]Respondent, citing *Central Citrus Co. v. Commissioner*, 58 T.C. 365 (1972), argues in his brief that the Court should not dissect or fragment the asset in its consideration of whether the asset is qualifying property. According to respondent, the Court has only "dissected" a structure where a portion came within an exception to the regulations. Respondent's argument misses the mark. The obvious reason to allocate, separate, fragment, or dissect is to determine whether *some* portion of the asset qualifies for the investment credit as governed by the Code, regulations, and pertinent case law. We have for some time not hesitated in determining that a portion of a structure or system is sec. 38 property while another portion is not. *Munford, Inc. v. Commissioner*, 87 T.C. 463 (1986); *Consolidated Freightways, Inc. v. Commissioner*, 74 T.C. 768 (1980), affd. on this point 708 F.2d 1385 (9th Cir. 1983); *Scott Paper Co. v. Commissioner*, 74 T.C. 137 (1980); *Central Citrus v. Commissioner, supra*; *Catron v. Commissioner*, 50 T.C. 306 (1968). Accordingly, we analyze not only the asset as a whole but also its separate functioning parts.

[13]Sec. 1.48-1(c) and (d)(1), Income Tax Regs., provides in part:

(c) * * * Thus, buildings, swimming pools, paved parking areas, wharves and docks, bridges, and fences are not tangible personal property. * * *

(d) *Other tangible property*—(1) *In general.* In addition to tangible personal property, any other tangible property (but not including a building and its structural components) used as an integral part of manufacturing, production, or extraction, * * *

[14]See also *Illinois Cereal Mills, Inc. v. Commissioner*, T.C. Memo. 1983-469, affd. 789 F.2d 1234 (7th Cir. 1986).

[15]Sec. 1.48-1(e)(1), Income Tax Regs., generally defines a building.

functions as a building. Since the functions of the compartments differ, we will examine the separate compartments according to their respective functions. *Munford Inc. v. Commissioner, supra.*

## 1. *The Loading Area*

The loading area, which is approximately 113 feet by 21 feet has doors up to which trucks back for loading and unloading of commodities. The area is refrigerated to a temperature of approximately 45 degrees.[16] This loading and unloading of commodities is the basic work that takes place in this area.

One of the criteria in determining whether or not a structure functions as a building is whether it furnishes working space to employees. If working space is provided, then the nature of the relationship between the working space and the activity of the employees must be examined. If the employee activity is merely incidental to[17] the principal function of the structure, then it would not be considered a building furnishing working space. *Consolidated Freightways, Inc. v. Commissioner,* 708 F.2d 1385. We believe that the facts here are similar to those in *Consolidated Freightways, Inc. v. Commissioner, supra.* In that case, the taxpayer, which operated numerous trucking terminals, placed in service a number of trucking terminal facilities, including loading docks, and claimed an investment tax credit with respect to the loading dock facilities. The Court examined the extent of human activity at the loading docks and concluded as follows:

Suffice it to say that the purpose of the dock, to move freight, is accomplished primarily by the efforts of those who work on the dock. The purpose of the dock is for more than "incidentally" to provide working space for the employees of petitioner. Human activities inside the docks were essential to the function of the docks. Both the quantity and quality ("nature") of work performed on the dock is sufficient, in our minds, to qualify them as buildings. [*Consolidated Freightways, Inc. v. Commissioner,* 74 T.C. at 796. Citations omitted.]

We believe that the result here should be the same as in *Consolidated Freightways, Inc. v. Commissioner, supra.* The

---

[16]See note 10 *supra.*

[17]See *Valmont Industries, Inc. v. Commissioner,* 73 T.C. 1059, 1072 (1980).

purpose of the loading area is to provide working space for the loading and unloading of commodities. This movement of commodities must be accomplished by human activity. Such human activity is more than "incidental" to the loading area. We thus conclude that the loading area is a building within the meaning of section 48(a)(1) and, thus, not section 38 property. See also *Munford, Inc. v. Commissioner, supra.*[18]

2. *The 55-Degree Compartment*

The 55-degree compartment is divided into two parts, a cutting area and a storage area, which are separated by a wire mesh barrier.

a. *Cutting area.*—The cutting area is 30.5 feet by 55 feet. Up to eight employees work in this area 8 hours per day cutting, cleaning, inspecting, and packaging chickens. Based on this finding there is no doubt that the cutting area constitutes a building, the purpose of which is to provide space for employees to perform their work. Certainly the human activity is *not* "incidental" to the primary function of the area. In fact, the primary function of this area is the very work performed by the employees. *Scott Paper Co. v. Commissioner,* 74 T.C. 137 (1980); *Central Citrus Co. v. Commissioner,* 58 T.C. 365 (1972); *Catron v. Commissioner,* 50 T.C. 306 (1968); *Consolidated Freightways, Inc. v. Commissioner,* 708 F.2d 1385. Accordingly this area functions as a building and is not section 38 property.

b. *Storage area.*—This storage area is approximately 30.5 feet by 15 feet. Miscellaneous products such as oils and shortenings are stored in this part, and the only work activity is that of stacking and unstacking the items stored there. The issue arises as to whether the storage area should be considered as part of the cutting area since the only separation is a wire mesh barrier. The parties have stipulated that there are five separate refrigerated areas or compartments and this is *one* of the five. We thus conclude that the entire 55 degree compartment ought to be considered as a unit. Accordingly, the storage area which is part

---

[18]See also *A.C. Monk & Co. v. United States,* 686 F.2d 1058, 1063 (4th Cir. 1982); *Yellow Freight System, Inc. v. United States,* 538 F.2d 790, 796 (8th Cir. 1976).

of this compartment is a building and, therefore, is not section 38 property.[19]

3. *The Remaining Compartments (Zero-Degree, 28-Degree, and 32-Degree)*

The parties have stipulated that the only employee work activity that takes place in the zero-degree compartment, the 28-degree compartment, and the 32-degree compartment is the stacking and unstacking of commodities which are stored in these areas. Accordingly, we are satisfied that the principal functions of these compartments are for storage and the human activity is merely incidental to the primary functions. See cases cited at notes 14 and 15 *supra*. Thus, these compartments are not buildings within the meaning of section 1.48-1(e)(1), Income Tax Regs. Nor are the compartments tangible personal property under section 48(a)(1)(A). In *Munford, Inc. v. Commissioner, supra* at 492, we held that a refrigerated structure claimed by the taxpayer to be a "large refrigerator" was not tangible personal property. We find *Munford* to be controlling and, therefore, hold that these three compartments are not tangible personal property.

We must next determine whether any of these remaining compartments qualify for the investment credit as "other tangible property" within the meaning of section 48(a)(1)(B)(i) or (iii). The first test under the regulations[20] is whether the property is used as an integral part of manufacturing, production, or extraction. These terms are further defined in the regulations.[21]

---

[19]The result would be the same whether we consider this as one compartment or as a separate storage area. If considered a separate storage area the compartment would not qualify for the same reasons that the zero degree and 28 degree compartments do not qualify as discussed, *infra*.

[20]Sec. 1.48-1(d)(1), Income Tax Regs., is cited at note 13 *supra*.

[21]Sec. 1.48-1(d)(2) and 4, Income Tax Regs., provides as follows:

(2) *Manufacturing, production, and extraction.* For purposes of the credit allowed by section 38, the terms "manufacturing", "production", and "extraction" include the construction, reconstruction, or making of property out of scrap, salvage, or junk material, as well as from new or raw material, by processing, manipulating, refining, or changing the form of an article, or by combining or assembling two or more articles, and include the cultivation of the soil, the raising of livestock, and the mining of minerals. Thus, section 38 property would include, for example, property used as an integral part of * * * the processing of meat, fish, or other foodstuffs;

 * * * * * * *

Respondent argues that, since the commodities are in prepackaged form and since they are merely stored under refrigeration, there is no "processing of foodstuffs." Petitioner argues that the overall activities and certainly the activities in the 55-degree room constitute the processing of foodstuffs. Thus petitioner concludes that the asset is used as an "integral part" of the specified activity.

As we pointed out in *Giannini Packing Corp. v. Commissioner*, 83 T.C. 526, 532 (1984), the controlling of atmospheric conditions has been recognized to be a part of the production processes. In *Brown-Forman Distillers Corp. v. United States*, 205 Ct. Cl. 402, 499 F.2d 1263 (1974), the taxpayer engaged in the distilling, aging, bottling, and marketing of bourbon whiskey. The taxpayer built special facilities to hold thousands of barrels of distillate. Temperature and humidity control were essential for the distillate. The Court held that these functions were an "integral part" of the processing of the bourbon whiskey.

In *Giannini Packing Corp.*, the taxpayer, who was in the business of acquiring, storing, and marketing fresh fruit, constructed a packing and storage facility. The first two rooms (pre-cooling rooms) were where the fruit was received in bins, cooled, removed from bins, sorted, and packed in cardboard cartons. The fruit was then stored in two other rooms (holding rooms) after it was packed. The rooms were cooled by the convection process. These rooms were specially designed and were essential to the aging and sweetening of the fruit. Respondent attempted to distinguish *Central Citrus Co. v. Commissioner*, 58 T.C. at 365, from *Giannini Packing Corp.*, in that in the former case the fruit was placed in the facility *before* processing and packaging was completed, whereas in the latter case, the fruit was held in boxes *after* packaging. In *Giannini Packing Corp., supra*

---

(4) *Integral part.* * * * Property is used as an integral part of one of the specified activities if it is used directly in the activity and is essential to the completeness of the activity. Thus, for example, in determining whether property is used as an integral part of manufacturing, all properties used by the taxpayer in acquiring or transporting raw materials or supplies to the point where the actual processing commences (such as docks, railroad tracks and bridges), or in processing raw materials into the taxpayer's final product, would be considered as property used as an integral part of manufacturing. Specific examples of property which normally would be used as an integral part of one of the specified activities are blast furnaces, oil and gas pipelines, railroad tracks and signals, telephone poles, broadcasting towers, oil derricks, and fences used to confine livestock.

at 534, we held that the holding rooms were an "integral part of * * * production."

In this case, there is no dispute that there is a processing activity in the 55-degree room. Since we have already determined that the 55-degree room does not qualify for the investment credit,[22] we look to determine if any other areas of the asset are used as an integral part of the qualified activity. The parties have stipulated that the poultry commodities (whole chickens and chicken parts which are cut into pieces) are stored in the 32-degree compartment. These items are stored at the lower temperature to prevent spoilage. Accordingly, we find that the 32-degree room is an integral part of the production process since at least a part of the business of petitioner is the cutting, packaging, cooling, and storing of chicken parts. See *Giannini Packing Corp. v. Commissioner, supra* at 534; *Central Citrus Co. v. Commissioner*, 58 T.C. at 373.

Our conclusion as to the 32-degree compartment is not inconsistent with *L&B Corp. v. Commissioner*, 88 T.C. 744 (1987), filed this date. There we held that the cold storage of meats and other food products is not a "processing of meat" within the meaning of section 1.48-1(d)(2), Income Tax Regs., and therefore not an "integral part of production" for purposes of section 48(a)(1)(B)(i). However, *L&B Corp.* is factually distinguishable from this case. Here, unlike in *L&B Corp.*, part of petitioner's business involved the cutting, cleaning, inspecting, and packaging of chickens. It is these activities, and the relationship of the 32 degree compartment thereto, which support our conclusion that that compartment constitutes an integral part of the production process.

The two remaining compartments of the asset are the zero-degree room and the 28-degree room. The parties have stipulated that all commodities (other than whole chickens and chicken parts which are processed in the 55-degree room and stored in the 32-degree room) are received in prepackaged form from independent third-party suppliers. Thus, the commodities stored in the zero-degree and 28-degree compartments are not processed in any way by

---

[22]In fact, it is this very "processing" conducted by *human activity* which has caused us to determine that the 55-degree rooms constitute a building.

petitioner. There is no evidence submitted by petitioner which would indicate that the commodities which are received in prepackaged form, stored in the zero-degree and 28-degree compartments, and ultimately sold are in any way changed in form.[23] See *L&B Corp. v. Commissioner, supra.* In this regard, petitioner has failed in its burden of proof to establish that the zero-degree and 28-degree rooms are an integral part of the production process.

We must now consider whether either the zero-degree or 28-degree compartments of the asset constitutes a facility used in connection with a qualified activity for the bulk storage of fungible commodities. Sec. 48(a)(1)(B)(iii).[24]

In order to qualify as a bulk storage facility the zero-degree and/or 28-degree compartments must have the following attributes:

(1) Facility used in connection with a qualified activity;
(2) Used for bulk storage;
(3) Storage of fungible commodities.

The parties have stipulated that the facility is used for storage of fungible commodities. Accordingly, this requirement is deemed satisfied. With respect to the question of whether there is a qualified activity, we refer to our discussion *supra*, in which we discuss and conclude that because the commodities stored in the zero-degree and 28-degree compartments are not processed by petitioner, these compartments are not used in connection with a

---

[23]To this extent, the record is not clear whether the prepackaged commodities are received in frozen or unfrozen form. If the commodities were received in unfrozen form and subjected to freezing by petitioner in the zero- or 28-degree compartments, we might have the issue of whether this "controlling of atmospheric conditions" which changed the form of the commodity was part of the production process. We do not have this issue before us since petitioner did not argue this and presented no evidence of this fact.

[24]Sec. 1.48-1(d)(5), Income Tax Regs., provides as follows:

(5) *Research or storage facilities.* (i) If property (other than a building and its structural components) constitutes a research or storage facility and if it is used in connection with an activity specified in subparagraph (1) of this paragraph, such property may qualify as section 38 property even though it is not used as an integral part of such activity. Examples of research facilities include wind tunnels and test stands. Examples of storage facilities include oil and gas storage tanks and grain storage bins. Although a research or storage facility must be used in connection with, for example, a manufacturing process, the taxpayer-owner of such facility need not be engaged in the manufacturing process.

(ii) In the case of property described in section 50, property will constitute a storage facility only if the facility is used principally for the bulk storage of fungible commodities. Bulk storage means the storage of a commodity in a large mass prior to its consumption or utilization. Thus, if a facility is used to store oranges that have been sorted and boxed, it is not used for bulk storage.

qualified activity. Accordingly, this condition is not satisfied, and the zero-degree and 28-degree compartments cannot qualify for investment credit as bulk storage facilities used in connection with a qualified activity.

## II. *Air-Cooled Condensers and Commercial Engine*

We must proceed further to determine if the air-cooled condensers and commercial engine or any parts thereof qualify for the investment credit. Respondent argues that even if we find that the asset is not a building under section 1.48-1(e)(1), Income Tax Regs., these parts of the asset are in any event structural components of a building.[25]

Thus, we need to determine whether the air-cooled condensers or commercial engine qualify for the investment credit or whether they are nonqualifying structural components. Petitioner cites specifically the provisions that exclude machinery, the sole justification for the installation of which is to meet temperature or humidity requirements which are essential for the operation of other machinery or the processing of materials or foodstuffs. Petitioner argues that the air-cooled condensers and commercial engine were installed precisely for the purpose of processing of foodstuffs.[26]

In support of its argument, petitioner cites Rev. Rul. 81-240, 1981-2 C.B. 11, 12. In that ruling, the taxpayer

---

[25]Sec. 1.48-1(e)(2), Income Tax Regs., provides as follows:

(2) The term "structural components" includes such parts of a building as walls, partitions, floors, and ceilings, as well as any permanent coverings therefor such as paneling or tiling, windows and doors; all components (whether in, on, or adjacent to the building) of a central air conditioning or heating system, including motors, compressors, pipes and ducts; plumbing and plumbing fixtures, such as sinks and bathtubs; electric wiring and lighting fixtures; chimneys; stairs, escalators, and elevators, including all components thereof; sprinkler systems; fire escapes; and other components relating to the operation or maintenance of a building. However, the term "structural components" does not include machinery the sole justification for the installation of which is the fact that such machinery is required to meet temperature or humidity requirements which are essential for the operation of other machinery or the processing of materials or foodstuffs. Machinery may meet the "sole justification" test provided by the preceding sentence even though it incidentally provides for the comfort of employees, or serves, to an insubstantial degree, areas where such temperature or humidity requirements are not essential. For example, an air conditioning and humidification system installed in a textile plant in order to maintain the temperature or humidity within a narrow optimum range which is critical in processing particular types of yarn or cloth is not included within the term "structural components". * * *

[26]Petitioner does not argue, nor is there any basis for an argument, that the air-cooled condensers and commercial engine are essential to the operation of *other machinery*. There is nothing in the record to indicate that there is *other machinery*.

rented storage space in rooms of varying temperatures depending upon the need of the customer. Some rooms had no temperature control (dry space), some rooms had temperature control (temperature maintained within a specific temperature range); and some rooms were refrigerated, e.g., 35 degrees or zero degrees. There were separate, individual-room refrigeration units (10 roof-top condenser units and 20 ceiling-mounted evaporators). No duct work was required. The Commissioner held that the refrigeration units which were used solely to provide cooling of perishable goods were not related to the ordinary operation or maintenance of the building but rather related to the cold storage and low-temperature spoilage prevention of customers' products. Thus, the ruling held that the units were not structural components of the building.

Respondent argues that there is no "processing" of materials or foodstuffs[27] in the structure, thus the exception provided by this regulation does not apply. While the term processing is not defined in this particular section of the regulation, section 1.48-1(d)(2), Income Tax Regs., states that the terms "manufacturing," "production," and "extraction" include "the processing of meat, fish, or other foodstuffs." Further, manufacturing, production, and extraction include construction or reconstruction, processing, manipulating, refining, or changing the form of an article. Respondent thus concludes that since the commodities were essentially stored in the same form in which they were received, there is no processing of foodstuffs.

Curiously enough, respondent's ruling (Rev. Rul. 81-240, 1981-2 C.B. 11, 12) appears to have ignored this aspect of the regulation. While the ruling cites section 1.48-1(e)(2), Income Tax Regs., it never considers the requirements of the "sole justification" test. While neither party raised this point of inconsistency, respondent attempts to distinguish the facts of this case from those of the ruling. Respondent argues that the units in the ruling were individual units, whereas, in this case, there is a centralized cooling system.

---

[27]Respondent admits that "processing" occurs in the 55-degree room, however this area has been disqualified based on its constituting a building because of the extent of human activity. See discussion *supra*.

We have carefully reviewed the record on this point. While it appears that there are separate condensers in the various compartments, it also appears, as best we can determine, that the system is entirely connected and operated by one large commercial engine. While the photographs do not reveal large vents or air conduits, the system is connected with pipes to each of the condensers. Thus, the system appears to be a *central* refrigeration system. Accordingly, we believe that these facts differ from those in respondent's ruling.[28] Thus, the air-cooled condenser and commercial engine do not satisfy the exceptions of section 1.48-1(e)(2), Income Tax Regs., since the sole justification for the installation of the system is not that it is essential for the operation of other machinery or processing of materials or foodstuffs. Instead, this central system has as one of its primary functions, the cooling and freezing of foodstuffs which petitioner does not in any way process (e.g., foodstuffs stored in the zero-degree and 28-degree compartments, which are received by petitioner, ready for sale to its customers).

The facts here differ from *Central Citrus Co. v. Commissioner*, 58 T.C. at 373-374, where we found that the blowers and coolers qualified under section 1.48-1(e)(2), Income Tax Regs., since the property was used to cool fruit during *packaging* and prior to shipment.

Based on the foregoing, we find for respondent except to the extent that the 32-degree room qualifies for investment tax credit.

*Decision will be entered under Rule 155.*

---

[28]Based on this finding, we need not pass on the correctness of respondent's ruling. In any event, the ruling represents "the contention of one of the parties to the litigation." See *Estate of Smead v. Commissioner*, 78 T.C. 43, 47 n. 5 (1982). Nor has petitioner argued that the ruling constitutes a consistent and long-standing administrative position with congressional or judicial approval. See *Crow v. Commissioner*, 85 T.C. 376 (1985). Cf. *United States v. Correll*, 389 U.S. 299 (1967); *Commissioner v. Stridger*, 386 U.S. 287 (1967).