FOX PHOTO INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Fox Photo, Inc. v. Commissioner
Docket No. 7283-88
United States Tax Court
T.C. Memo 1990-348; 1990 Tax Ct. Memo LEXIS 360; 60 T.C.M. (CCH) 85; T.C.M. (RIA) 90348; July 10, 1990, Filed *360 Decision will be entered under Rule 155. Eric R. Fox, for the petitioner. William E. Bogner and Vijay S. Rajan, for the respondent. TANNENWALD, Judge. TANNENWALD
MEMORANDUM OPINION Respondent determined deficiencies in petitioner's Federal income taxes as follows: Taxable Year Ended
Deficiencies
3/31/82
$ 69,342.00 [1]
4/30/83
605.00 [2]
4/28/84
12,732.00   4/27/85
32,012.00   After concessions, the issues for decision are: (1) whether petitioner's one-hour photo labs and their concrete foundations are section 38 [3] *361 property as defined by section 48 qualifying for the investment tax credit (ITC); (2) whether the labs and their concrete foundations are 5-year property or 15- and 18-year real property [4] for purposes of taking accelerated cost recovery (ACRS) deductions pursuant to section 168; and (3) if the labs are 15- and 18-year real property, whether petitioner may use the straight-line method of cost recovery in section 168(b)(3)(A) for them. All of the facts have been stipulated and are found accordingly. The stipulation of facts and exhibits are incorporated herein by reference. Petitioner is a Delaware corporation which had its principal office in San Antonio, Texas, at the time the petition was filed in this case. Prior to and during the years in issue, it was engaged in the retail, wholesale, and mail order photofinishing business and in retail sales of photographic supplies. Beginning in the early 1980s, petitioner offered on-site film development and sold photographic supplies at "one-hour labs," located predominantly in shopping center parking lots. Petitioner placed 35 labs in service during its fiscal years 1984 and 1985. [5] Each prefabricated lab was a 24-foot wide, 28-foot long, and 12-foot high enclosed rectangular structure with a permanent concrete foundation. Each had exterior *362 and interior walls, a ceiling, a roof with gutters, a floor, two external and two internal doors, windows, lighting fixtures, and a restroom. Each was supplied with water, electricity, a telephone, a sewer connection and had a central air conditioning and heating system. The labs contained numerous furnishings and fixtures, including work counters, cabinets, display cases, and a hot water heater. Each lab had its own address. A contractor constructed the labs at his place of business. The principal building components of the labs included 10-inch "I" beams, 2-inch by 4-inch steel structural tubing, .188 gauge steel walls, roof panels, polished plate and tempered glass, wall porcelain panels and clear curved glazing. The steel frame components of the labs were reinforced beyond the support requirements for a similar structure of otherwise comparable size and materials which was not intended to be moved. This reinforcement allowed the *363 lab halves to be moved without the threat of collapse. The contractor built the labs in two halves measuring 12 feet wide, 28 feet long, and 12 feet high so that the halves would fit on the trucks used to move them to the lab sites. Together, the lab halves weighed 54,000 pounds. Petitioner entered into ground leases with the owners of the property upon which the labs would be located. Petitioner intended to leave the labs on their original sites for an indefinite time. The leases were for 5 years, with an option which petitioner could unilaterally exercise to extend the lease, in most instances, for two 5-year periods or, in a few instances, for one 5-year period. Many of the leases included an "economic adversity" provision allowing petitioner to terminate the lease and move the lab when business at the site became uneconomic. The leases required petitioner to remove the labs upon termination of the lease and restore the premises to the condition which existed prior to the lease, including removing the concrete foundations at the landlord's request. After petitioner leased a site, the site contractor constructed the lab foundation. The contractor poured continuous concrete *364 footings into trenches dug around the exterior wall perimeters of the labs, after removing the parking lot asphalt. The footings were approximately 24 inches deep, 12 inches wide, and extended 2 or 3 inches above ground level. A concrete footing of the same dimensions was also poured in a trench dug lengthwise along the center line of the area to be covered by the labs (the split line), directly below where the two lab halves were to be joined. The footings were reinforced with iron reinforcing bars. At the same time the foundation footings were poured, the contractor poured a concrete base approximately 4 or 5 inches thick, reinforced with iron reinforcing bars. Steel weld plates measuring 10 inches wide, 10 inches long, and 3/8ths of an inch thick were inserted into the concrete foundation. Each weld plate had four "L" shaped legs, 5 to 8 inches in length, attached to its bottom side which were completely submerged in the concrete. The average lab foundation contained 22 weld plates spaced about every 5 feet around the perimeter of the foundation and the split line footing. When the concrete had hardened, two 40-foot flat bed semi-truck trailers hauled the lab halves to the *365 site. At the site, a heavy duty crane lifted the lab halves onto the foundation. The lab halves were bolted together and joined with cap flashings and silicon caulking. Then, the "I" beams under the lab halves were tack welded to six weld plates, located at each of the four corners of the lab and at the two junctures of the split line footing and the perimeter footing. A hard foam pad was placed against the exterior of the "I" beams as a moisture barrier and to prevent concrete from adhering to the beams in the event the concrete later was removed. Concrete curbing was then poured on all sides of the lab so that the interior edge of the concrete came in contact with the perimeter "I" beams protected by the foam. To finish the labs, the site contractor connected the utilities to the previously installed systems of the lab, installed a plastic sign reading, "FOX PHOTO 1-HR LAB," around the top perimeter of the labs, painted directional arrows and the words "DRIVE THRU" on the asphalt close to the lab, and planted shrubbery around the lab. On average, petitioner allowed 1 week for site preparation, including laying the foundation, 1 week for delivery and assembly of the lab, and 2 *366 weeks for finishing the lab and the surrounding area. Petitioner took a week, on average, to install and test its equipment inside the labs. The estimated useful life of each of the labs is 50 years. The average cost of an uninstalled lab, not including the air conditioning system, was $ 48,579. The average installation cost per lab was $ 28,035.92, exclusive of the costs of the concrete foundations and the air conditioning systems. The average cost of a concrete foundation was $ 28,622.39. The average cost of a central air conditioning system was $ 10,274.14. Petitioner's labs were typically open to the public from 9:00 a.m. to 6:30 p.m., Monday through Friday, and from 9:00 a.m. to 5:00 p.m. on Saturday. Petitioner emphasized personal service to its customers and considered the availability of on-site employees an important aspect of such service. The labs were staffed with one to four employees depending on the amount of business activity, including a store manager, a photo technician responsible for developing photographs, and a retail salesperson. The labs contained three interior work areas: the retail area, the film development area, and the storeroom. Petitioner's employees *367 accepted film for developing, returned finished photographs to drive-up and walk-in customers, and sold photographic supplies in the retail area. The salesperson worked behind a traditional sales counter that separated the public walk-in area from the film developing and storeroom areas. Employees developed the photographs in the film development area. In this area, separate work stations were designated for each stage in film developing. Petitioner's employees operated numerous pieces of equipment when developing film. All the supplies for the labs were kept in the storeroom. Petitioner's employees mixed chemicals and operated silver recovery equipment in this room. The store manager's desk was in the storeroom. Although petitioner constructed the labs so they could be moved from their original site, none of the 35 labs in question were moved during the years in issue. Subsequent to the years in issue, petitioner had between 75 and 80 labs in service and moved 5 labs, including 3 of the 35 labs in issue. To prepare the labs for removal, a contractor disconnected the utilities and removed the wrap-around sign. The contractor then broke up and removed the concrete from around *368 the lab with a track loader. After the weld points were exposed, the contractor cut the "I" beams of the lab from the weld plates with acetylene cutting torches. The two lab halves then were unbolted and separated. Two heavy duty cranes lifted the lab halves onto two flatbed trucks. The trucks moved the halves either to storage or to a location where they were refurbished for use at another site. The concrete foundation was either removed with a jack hammer or track loader when the lease terminated or reused for another lab if the site remained leased. Removal of the labs took about five men approximately 12 to 18 hours over a 2- to 3-day period. The cost of moving a lab was approximately $ 6,000 in 1987. To restore a lab site to its original condition required an additional 32 hours at an additional cost of $ 9,500. In 1987, the cost of repairing and refurbishing a lab for reuse after its removal was approximately $ 19,000. For its taxable years 1984 and 1985, petitioner treated its one-hour labs as section 38 property claiming ITC on its Federal income tax returns with respect to its investment in the labs placed in service in those fiscal years. Petitioner also treated its *369 one-hour labs, exclusive of the foundations, as "5-year property" and claimed ACRS deductions on its Federal income tax returns for 1984 and 1985 based on the applicable percentages in section 168(b)(1). Although petitioner did not elect, pursuant to section 168(f)(4), the straight line method of recovery in section 168(b)(3), petitioner now claims it is entitled to use the straight line method if we determine that the labs are 15- or 18-year real property. Although petitioner did not claim ITC on its Federal income tax returns for the concrete foundations placed in service during the fiscal years 1984 and 1985, petitioner now claims that the concrete foundations are property qualifying for the ITC for those years. [6] *370 On its Federal income tax returns, petitioner classified the foundations as "15-year real property" for its taxable year 1984 and as "18-year real property" for its taxable year 1985, and took ACRS deductions on that basis. Petitioner now claims that the concrete foundations are items of 5-year property eligible for additional ACRS deductions. In his notice of deficiency, respondent disallowed the ITC claimed on the labs on the grounds that the labs did not meet the requirements of section 38 as defined in section 48. Respondent also disallowed petitioner's claimed ACRS deductions based on his determination that the labs constitute 15- and 18-year real property under the ACRS system, not 5-year property. Respondent also denies that the concrete foundations are eligible for ITC and that they are 5-year real property for purposes of the ACRS deduction as petitioner now claims. Section 38 allows the investment tax credit against tax for investments in certain types of property, described as "section 38 property." [7] Section 38 property is defined in section 48(a)(1)[8] as "tangible personal property" or "other tangible property (not including a building and its structural components)" used in production or manufacturing or in furnishing various services. Section 1.48-1(c), Income Tax Regs., defines "tangible personal property" as "any tangible property except land and improvements thereto, such as buildings or other inherently permanent *371 structures (including items which are structural components of such buildings or structures)." Respondent contends that the labs are "buildings" and their foundations are "structural components" that are ineligible for the ITC because both "buildings" and "structural components," defined in section 1.48-1(e), Income Tax Regs., [9] *373 *374 are excluded *372 from the definition of "tangible personal property" in section 1.48-1(c), Income Tax Regs. Petitioner concedes that the labs are buildings under the appearance and function test in section 1.48-1(e), Income Tax Regs., but argues that the one-hour labs are tangible personal property within the meaning of section 48(a)(1)(A) and the regulations thereunder because they are not inherently permanent. Petitioner contends that the concrete foundations are also tangible personal property because they derive their character from the one-hour labs for ITC purposes. In making our determination of whether the labs and their concrete foundations are tangible personal property, we do not consider the air conditioning systems which the parties have agreed to treat consistent with our decision on the labs. We first discuss whether the labs are tangible personal property within the meaning of section 48(a)(1)(A) eligible for the ITC. The dispute in this case centers around the definition of tangible personal property in section 48(a)(1)(A) and section 1.48-1(c), Income Tax Regs., and the exclusion of "buildings" as defined in section 1.48-1(e), Income Tax Regs., from that definition. [10] Petitioner argues that the labs *375 are not tangible personal property because they are readily movable and therefore not inherently permanent. Respondent counters that because section 1.48-1(c), Income Tax Regs., excludes buildings from the definition of "tangible personal property," petitioner's concession that the labs are buildings under the appearance and function test of section 1.48-1(e)(1), Income Tax Regs., resolves the threshold issue that the labs are buildings and therefore are not tangible personal property. Respondent argues that an inquiry into whether the labs are inherently permanent is superfluous to our determination of whether the labs are tangible personal property. Alternatively, respondent argues that the labs are not tangible personal property because they are inherently permanent structures. In advancing his theory of the inquiry required by the regulations, respondent relies on cases like Loda Poultry Co. v. Commissioner, 88 T.C. 816 (1987), Munford v. Commissioner, 87 T.C. 463 (1986), affd. 849 F.2d 1398 (11th Cir. 1988), Samis v. Commissioner, 76 T.C. 609 (1981), and Roberts v. Commissioner, 60 T.C. 861 (1973), *376 in which we started our inquiry into whether particular property was tangible personal property by first determining whether it was a "building" under the appearance and function test of section 1.48-1(e)(1), Income Tax Regs. We used the appearance and function test in those cases, because unlike the case before us now, the taxpayers did not argue and the records did not indicate that the property in question was movable. Loda Poultry Co. v. Commissioner, 88 T.C. at 824; Munford v. Commissioner, 87 T.C. at 489; Samis v. Commissioner, 76 T.C. at 617; Roberts v. Commissioner, 60 T.C. at 866. In cases in which the issue of movability has been involved, we have approached the question of whether the property was a "building" by determining whether the structure was inherently permanent. In Moore v. Commissioner, 58 T.C. 1045, 1052 (1972), affd. per curiam 489 F.2d 285 (5th Cir. 1973), we held that, since the regulations (section 1.48-1(c), Income Tax Regs.): cite[s] "buildings or other inherently permanent structures" [n7] as examples of improvements to land, * * * to fit the definition of a building, an item of property must be an inherently permanent structure on the land. Cf. Estate of Shirley Morgan, 52 T.C. 478, 482-484 (1969), *377 affirmed per curiam 448 F.2d 1397 (C.A. 9, 1971). * * * 7 Emphasis to the word "other" has been added by the Court. This language in the regulations follows closely the language of the congressional committee reports that accompanied the initial enactment of the investment credit provisions. See H. Rept. No. 1447, 87th Cong., 2d Sess. (1962), and S. Rept. No. 1881, 87th Cong., 2d Sess. (1962).
The mobile homes in Moore were set on concrete blocks and were capable of being moved from their sites on their own wheels. The fact that the mobile homes had the general physical and functional characteristics of buildings did not lead us to conclude that they were "buildings" as defined in the regulations, since they were never affixed to the land and remained at all times movable. [11]Moore v. Commissioner, supra at 1051-1052.
In Moore, respondent argued that the mobile homes were buildings by *378 virtue of their functional use. 58 T.C. at 1052. In response to this argument, we stated that we had never held nor did the regulations suggest that functional use is the sole criterion by which the status of an item of property is to be determined, rather: It is apparent that before the "functional use" test can properly be applied in this case, it must first be shown that the trailers were permanent improvements to land. * * * [T]his requirement is fully consistent with the respondent's own regulations and with congressional intent. [58 T.C. at 1053.]
Cf. Film N'Photos, Inc. v. Commissioner, T. C. Memo. 1978-162. Thereafter, respondent agreed with our position. In Rev. Rul. 77-8, 1977-1 C.B. 3, 4, respondent ruled that trailers used as offices were not to be automatically classified as buildings since "it must [first] be determined whether the trailers are permanent improvements to the land." Respondent now urges us to follow the contrary approach in applying the definition of a "building" articulated by the Court of Appeals for the Seventh Circuit in McManus v. United States, 863 F.2d 491, 497 (1988). In that case, the Seventh Circuit stated that the initial inquiry under section 48 *379 and the regulations thereunder is whether a structure is a building without requiring what it considered was an additional inquiry into the permanence of the structure. 863 F.2d at 497. In reaching its conclusion, the Seventh Circuit cited Illinois Cereal Mills, Inc. v. Commissioner, 789 F.2d 1234 (7th Cir. 1986), affg. a Memorandum Opinion of this Court, for the general law of applying the test for tangible personal property. 863 F.2d at 497. In Illinois Cereal Mills, however, the Court had stated: The test for "tangible personal property" focuses on whether the property in question is an "inherently permanent structure." [Citations omitted.] Thus cases and Treasury rulings have determined that property that is easily removable * * * is section 38 property and qualifies for the ITC. [Fn. ref. omitted; 789 F.2d at 1236.]
This apparent contradiction in the Seventh Circuit's approach to the issue is just one example of the morass of approaches taken by various courts in applying what has become a complex definition of "building" for purposes of the ITC -- a complexity that is recognized by numerous commentators. See, e.g., Note, "Undermining the Foundation of the ITC Building Exclusion," *380 37 Tax Lawyer 649 (1984); Tanck, "Investment Tax Credit: A New Test For 'Inherently Permanent,'" 31 S.D. L.Rev. 800 (1986); Orndorff, "Investment Tax Credit and Buildings," 16 Idaho L. Rev. 45 (1979); Shapiro, "Investment Tax Credit: Current Rules and Interpretations," 15 Cumb. L. Rev. 411 (1985). We adhere to our position stated in Moore v. Commissioner, 58 T.C. at 1051-1053, particularly in light of the fact that the Fifth Circuit affirmed that decision -- the same circuit that has jurisdiction to decide an appeal of this case. Cf. Golsen v. Commissioner, 54 T.C. 742, 756-757 (1970), affd. 445 F.2d 985 (10th Cir. 1971). In fact, in affirming our decision in Moore, the Fifth Circuit relied on two cases, Minot Federal Savings & Loan Assn. v. United States, 435 F.2d 1368 (8th Cir. 1970), and King Radio Corp. v. United States, 486 F.2d 1091 (10th Cir. 1973), that held that a determination of whether property was tangible personal property was based on whether the property was inherently permanent. In King Radio, the Court of Appeals for the Tenth Circuit specifically addressed the issue of a functional use test versus a permanency test and opted for the latter stating: Our review *381 of the Revenue Act of 1962, its legislative history, and the Treasury Regulations enacted thereunder leads us to the conclusion that the decision in Minot in favor of the taxpayer is a correct interpretation of congressional intent in this area, and that the permanency test applied in that case is an accurate characterization of the approach envisioned by Congress and the Treasury Regulations themselves. [486 F.2d at 1095.]
Thus, we are satisfied that the Fifth Circuit's reliance on Minot and King Radio is not limited by the fact that the issue in those two cases concerned whether partitions were structural components. Since we have decided that the test of whether the labs are buildings for purposes of the ITC includes a determination of whether the labs were inherently permanent, we now address the issue of permanence. Whether property is inherently permanent depends upon the fashion in which it is affixed to the land and how permanently it is designed to remain in place. Everhardt v. Commissioner, 61 T.C. 328, 330 (1973); Roberts v. Commissioner, 60 T.C. at 866. Even if property is annexed to land, this fact alone does not preclude the property from being considered tangible personal *382 property if it is readily movable. Estate of Morgan v. Commissioner, 52 T.C. 478, 483 (1969), affd. per curiam 448 F.2d 1397 (9th Cir. 1971). In making our determination of whether the labs are readily movable, we consider the six-part test of Whiteco Industries, Inc. v. Commissioner, 65 T.C. 664, 672-673 (1975): (1) Is the property capable of being moved and has it in fact been moved? (2) Is the property designed or constructed to remain permanently in place? (3) Are there circumstances which tend to show the expected or intended length of affixation, i.e., are there circumstances which show that the property may or will have to be moved? (4) How substantial a job is removal of the property and how time-consuming is it? Is it readily removable? (5) How much damage will the property sustain upon its removal? (6) What is the manner of affixation of the property to the land? We find that the manner in which the labs themselves were constructed and the way they were set on their concrete foundations show that they were capable of being moved and were constructed so that they could be moved satisfying Whiteco factors 1 and 2. The use of reinforced steel in the lab units and the fact *383 that the labs were only attached to the foundation at six welds and that a hard foam pad prevented the concrete curbing from adhering to the lab's "I" beams support our conclusion as required by Whiteco factor 6. In this context, the concrete curbing was easily removable and did not add the element of permanency associated with the usual building. The fact that petitioner stipulated that it intended to leave its labs at their orginal locations indefinitely does not require a different conclusion. The lease provisions, allowing petitioner to terminate in the event of "economic adversity" and requiring petitioner to move the labs upon expiration of the fixed term of the lease or other termination, show that it was contemplated that the labs might have to be moved and, in fact, in subsequent years, labs were moved. Thus, Whiteco factor 3 is satisfied. Lastly, the labs could be moved in 12 to 18 hours by five men in 2 to 3 days sustaining damage that was cheaper to repair than building a new lab in accordance with Whiteco factors 4 and 5. The proper application of the Whiteco factors rests on the premise that movability itself is not the key determinant of lack of permanence. Accord *384 Kramertown Co. v. Commissioner, 488 F.2d 728, 731 (5th Cir. 1974), affg. a Memorandum Opinion of this Court. Concededly, almost any building or structure can be moved given ample time and manpower, e.g., the London Bridge was dismantled and moved to Arizona. See Mallinckrodt, Inc. v. Commissioner, T. C. Memo. 1984-532 (fn. 7), affd. per curiam 778 F.2d 402 (8th Cir. 1985). Our decision herein rests not on movability alone but on a determination that the labs were readily movable and constructed in anticipation of being moved quite unlike the usual building. In this vein, we note that, while the labs may have had the appearance of buildings, depending on the viewer's perception, in our view, they did not have the appearance of permanency. Indeed, their location in parking lots and not in the shopping center strips further suggests a lack of permanency. We do not agree with respondent that, because the mobile homes in Moore v. Commissioner, supra, were on wheels, the readily movable test is limited to situations where movability is visibly apparent. The six factors established in Whiteco Industries, Inc. v. Commissioner, supra, clearly support a broader facts and circumstances test. *385 In this connection, we note that, in Film N' Photos, Inc. v. Commissioner, supra, we applied the test of Moore and held that photo labs not significantly different from those involved herein constituted "tangible personal property" for purposes of the ITC. Based on the evidence in the record, we hold that the labs are not inherently permanent and are therefore tangible personal property within the meaning of section 48(a)(1)(A) for purposes of claiming the ITC. In contrast to the one-hour labs, the concrete foundations are immovable and inherently permanent structures as petitioner has conceded. Citing Weirick v. Commissioner, 62 T.C. 446, 453 (1974), petitioner argues, however, that the foundations should derive the character of tangible personal property from the labs since the foundations are an integral part of the labs. In this case, the labs can be removed from their foundations, which are left behind. Thus, the foundations are not an integral part of the labs. See Standard Oil Co. (Indiana) v. Commissioner , 77 T.C. 349, 405 (1981); Estate of Morgan v. Commissioner, 52 T.C. at 483-484. In fact, when a lab was removed from a foundation, the foundation could be and was used *386 on occasion to anchor a replacement lab on the same site. Given petitioner's concession that the concrete foundations are inherently permanent structures, it follows that they do not qualify as tangible personal property under section 48(a)(1)(A) and section 1.48-1(c), Income Tax Regs. In light of this conclusion, we need not address whether the foundations were "structural components" as urged by respondent. The parties agree that whether the labs and the concrete foundations qualify for 5-year depreciation is dependent on whether they qualify for the ITC. Secs. 1245(a)(3), 168(b)(1), and 168(c)(2)(B). The labs do qualify for the ITC under section 48(a)(1)(A) and, therefore, may be depreciated on a 5-year basis as petitioner did on his returns for the years in issue. The foundations, however, are not eligible for the ITC under section 48(a)(1)(A) and cannot be depreciated on the 5-year basis. Petitioner properly depreciated the foundations on a 15- and 18-year basis on its 1984 and 1985 returns, respectively. Our holdings make it unnecessary to address the alternative issue of whether petitioner may elect the straight-line method of depreciation with respect to the labs if we *387 had found them to be real property. This issue was not raised with respect to the concrete foundations, so our inquiry is complete. Decision will be entered under Rule 155. Footnotes
1. This deficiency is a result of respondent's adjustment to the carryback of investment tax credit from the taxable year 1984.↩
2. The parties do not dispute this deficiency.↩
3. Unless indicated otherwise, all section references are to the Internal Revenue Code as in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.
4. The labs and concrete foundations placed in service after March 15, 1984, would be considered 18-year real property pursuant to amendments to sec. 168 made by sec. 111(a) of Pub. L. 98-369 (1984), 98 Stat. 494.↩
5. Of the 35 labs, we focus our opinion on the 33 model MLD labs that were essentially identical in design, because the parties have stipulated that they will apply our rulings to the two labs that differed in design and dimension from the MLD labs.↩
6. Although petitioner now also claims ITC for foundations placed in service during its fiscal year 1983, we do not discuss 1983 because the parties do not dispute the deficiency for that year. See page 2 and n.2, supra↩.
7. The ITC was repealed by sec. 211(a) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2166, effective, subject to transition rules, for property placed in service after Dec. 31, 1985.↩
8. Sec. 48(a)(1) provides in relevant part as follows: (1) In general. -- * * * the term "section 38 property" means -- (A) tangible personal property (other than an air conditioning or heating unit), or (B) other tangible property (not including a building and its structural components) but only if such property -- * * * * * * Such term includes only recovery property (within the meaning of section 168 without regard to any useful life) and any other property with respect to which depreciation (or amortization in lieu of depreciation) is allowable and having a useful life (determined as of the time such property is placed in service) of 3 years or more. * * *↩
9. Sec. 1.48-1(e), Income Tax Regs., defines building and structural components, in pertinent part, as follows: (e) Definition of building and structural components. (1) * * * The term "building" generally means any structure or edifice enclosing a space within its walls, and usually covered by a roof, the purpose of which is, for example, to provide shelter or housing, or to provide working, office,parking, display, or sales space. The term includes, for example, structures such as apartment houses, factory and office buildings, warehouses, barns, garages, railways or bus stations, and stores. Such terms include any such structure constructed by, or for, a lessee even if such structure must be removed, or ownership of such structure reverts to the lessor, at the termination of the lease. Such term does not include (i) a structure which is essentially an item of machinery or equipment, or (ii) a structure which houses property used as an integral part of an activity specified in section 48(a)(1)(B)(i) if the use of the structure is so closely related to the use of such property that the structure clearly can be expected to be replaced when the property it initially houses is replaced. Factors which indicate that a structure is closely related to the use of the property it houses include the fact that the structure is specifically designed to provide for the stress and other demands of such property and the fact that the structure could not be economically used for other purposes. Thus, the term "building" does not include such structures as oil and gas storage tanks, grain storage bins, silos, fractionating towers, blast furnaces, basic oxygen furnaces, coke ovens, brick kilns, and coal tipples. (2) The term "structural components" includes such parts of a building as walls, partitions, floors, and ceilings, as well as any permanent coverings therefor such as panelling or tiling; windows and doors; all components (whether in, on, or adjacent to the building) of a central air conditioning or heating system, including motors, compressors, pipes and ducts; plumbing and plumbing fixtures, such as sinks and bathtubs; electric wiring and lighting fixtures; chimneys; stairs, escalators, and elevators, including all components thereof; sprinkler systems; fire escapes; and other components relating to the operation or maintenance of a building. * * *
10. Petitioner has conceded that the labs are not "other tangible property" as described in sec. 48(a)(1)(B)↩.
11. Although we held that the mobile homes were tangible personal property, they did not qualify for the ITC because they were primarily used for lodging by nontransients pursuant to sec. 48(a)(3). Moore v. Commissioner, 58 T.C. 1045, 1053-1054 (1972), affd. per curiam 489 F.2d 285↩ (5th Cir. 1973).